# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-13-00101-CV

**Rent-A-Center, Inc., Appellant**

v.

**Glenn Hegar, in his capacity as Comptroller of Public Accounts of the State of Texas; and Ken Paxton, in his capacity as Attorney General of the State of Texas, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. D-1-GN-11-001059, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

### O P I N I O N

This case presents an issue of first impression: whether a "rent-to-own" business whose majority of revenues comes from making merchandise available to customers via "rental-purchase" agreements is "primarily engaged in retail trade" for Texas franchise-tax purposes.[1] The Comptroller audited Rent-A-Center, Inc.'s franchise tax return for 2008 and assessed a deficiency of over one million dollars because it determined that Rent-A-Center was not primarily engaged in

---

[1] Recent amendments to the Tax Code render this issue moot going forward. *See* Tex. Tax Code § 171.0001(12)(D) (definition of "retail trade" now specifically includes "rental-purchase agreement activities regulated by Chapter 92, Business & Commerce Code" as well as several other activities involving rental of items). However, the statute applicable at the time of the dispute was silent on the subject of rental-purchase agreements. *See* Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 2, sec. 171.0001(12), 2006 Tex. Gen. Laws 1, 2 (amended 2015) (current version at Tex. Tax Code § 171.0001(12)(D)). We may not look to the recent legislature's amendments for insight on the intent or understanding of a previous legislature. *See Strayhorn v. Willow Creek Res., Inc.*, 161 S.W.3d 716, 722 (Tex. App.—Austin 2005, no pet.).

retail trade and not, therefore, entitled to the one-half-percent tax rate with which Rent-A-Center calculated its taxes. *See* Tex. Tax Code § 171.002(a), (b) (franchise tax is one percent of taxable margin except for entities "primarily engaged in retail or wholesale trade," which are subject to one-half-percent rate).

Rent-A-Center paid the deficiency under protest and filed a suit for a refund. *See id.* §§ 112.001, .051, .052. The case was tried before a jury, but the trial court dismissed the jury after determining that the only issues in dispute were legal questions for the court to decide. The trial court held that Rent-A-Center is not entitled to a refund.[2] Because we conclude that Rent-A-Center is primarily engaged in retail trade, we reverse the trial court's judgment, render judgment that Rent-A-Center is entitled to a refund based on computing its taxes with the one-half-percent tax rate, and remand this cause for a determination of the amount of refund to which Rent-A-Center is entitled.

## BACKGROUND

Rent-A-Center is the largest "rent-to-own" business in the United States, operating over 3,000 stores nationwide, in Canada, and in Puerto Rico. Through its showrooms, Rent-A-Center offers its customers merchandise in four basic product categories: furniture and accessories, major consumer electronics, appliances, and computers. All of the merchandise is available for immediate purchase from the showroom floor by payment with cash or credit card. However, the vast majority

---

[2] Because of its legal determination on Rent-A-Center's entitlement to a refund, the trial court did not reach the second main issue at trial: the amount of deduction for the cost of goods sold that Rent-A-Center is entitled to deduct from its total revenue. *See* Tex. Tax Code §§ 171.101, .1012(c-f) (taxable margin is lesser of (1) 70% of total revenue or (2) amount of total revenue, reduced by (a) compensation paid to individuals serving active military duty and (b) *either* cost of goods sold or other compensation paid).

of Rent-A-Center's revenue derives from payments for merchandise made available to customers on a "rent-to-own" basis pursuant to "rental-purchase agreements." Under such an agreement, the customer may choose among weekly, semi-monthly, or monthly payment intervals. Payment is due at the beginning of each term, and the agreement renews automatically for another term upon receipt of each payment.

The agreements further provide that a customer acquires ownership of the merchandise by making all required payments over a specified period of time; the average full term for a merchandise item is eighteen months, which is substantially shorter than the useful life of the merchandise. While a customer may terminate the agreement at any time and return the merchandise without penalty—and may later "reinstate" the agreement by receiving credit for the payments already made on either the same or substantially the same merchandise—Rent-A-Center may not terminate the agreement so long as the customer fulfills its terms.

In addition to the automatic ownership transfer after the period established in the rental-purchase agreement, the agreements provide two other flexible options through which customers may sooner acquire ownership of the merchandise: (1) a "90-days same as cash" provision, by which the customer may purchase the merchandise by paying the specified "cash purchase price" within ninety days of entering into the agreement; and (2) an "early purchase option," by which the customer pays a specified percentage of the amount of remaining payments due at the time such option is exercised. Merchandise that has been returned to or repossessed by Rent-A-Center is refurbished and made available to customers under similar terms as new merchandise, with a price adjustment to reflect that the merchandise is used.

3

Ninety-seven percent of Rent-A-Center's merchandise is sold to customers by means of showroom-floor cash purchases, "90-days same as cash," "early purchase options," or completion of all scheduled payments under rental-purchase agreements. The remaining three percent that is not sold is merchandise that is stolen, damaged, or lost through casualty. In 2007, the average time that a merchandise item spent in Rent-A-Center's system was twenty months, including time in a customer's possession while subject to a rental-purchase agreement plus any idle time in inventory, and ownership to any given item transferred to a customer after an average of three rental-purchase agreements. Also in 2007, over ninety percent of Rent-A-Center's revenues were from payments received under rental-purchase agreements.

In its original franchise tax report for 2008,[3] Rent-A-Center reported that its business activities were described in Division G (Retail Trade) of the Standard Industrial Classification (SIC) Manual and asserted that it was subject, therefore, to the one-half-percent tax rate applicable to entities primarily engaged in retail trade. *See* Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 2, sec. 171.0001(12), 2006 Tex. Gen. Laws 1, 2 (amended 2015) (current version at Tex. Tax Code § 171.0001(12)) ("Former Section 171.0001(12)"); Tex. Tax Code § 171.002(a), (b). Rent-A-Center also claimed a deduction for its cost of goods sold in the amount of $1,200,108,807. In an audit of this report, the Comptroller determined that Rent-A-Center was a service business under Division I (Services) of the SIC Manual and that, accordingly, Rent-A-Center was not eligible for the one-half-percent rate but instead was subject to the one-percent tax rate for

---

[3] A tax report for a given year is based on revenues and other financial data from the previous year. *See Universal Frozen Foods Co. v. Rylander*, 78 S.W.3d 588, 590 (Tex. App.—Austin 2002, no pet.).

entities not primarily engaged in retail trade. *See* Tex. Tax Code § 171.002(a), (b). Additionally, the Comptroller disallowed Rent-A-Center's claimed deduction for cost of goods sold. The Comptroller issued an Adjustment Report assessing a deficiency of $1,070,683.67, plus interest. Rent-A-Center paid this amount under protest and, in this lawsuit, seeks a refund.

## DISCUSSION

The basic facts in this case are not in dispute, and the only issue for our review is the proper application of the franchise-tax statutes to the undisputed facts, requiring us to determine whether Rent-A-Center is "primarily engaged" in retail trade. *See id.* § 171.002(c) (taxable entity is primarily engaged in retail or wholesale trade if "total revenue from its activities in retail or wholesale trade is greater than the total revenue from its activities in trades other than the retail or wholesale trades"); Former Section 171.0001(12) ("retail trade" means "the activities described in Division G of the 1987 Standard Industrial Classification Manual published by the federal Office of Management and Budget"). Essentially, we are asked to determine whether the trial court properly concluded that Rent-A-Center's rent-to-own activities are more like leasing than selling. We conclude that they are not. Rather, we conclude that the majority of Rent-A-Center's activities constitute retail trade and—because the majority of its revenues comes from such activities—it is primarily engaged in retail trade as a matter of law.

The construction of a statute is a question of law that we review de novo. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008). Our primary objective in construing statutes is to give effect to the legislature's intent, which we seek first and foremost in the statutory text. *Id.* Absent legislative definition, we rely on the plain meaning of the text unless a different

meaning is apparent from the context or application of the literal language would lead to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). If an undefined term has multiple common meanings, we will apply the definition most consistent with the context of the statutory scheme. *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180-81 (Tex. 2013).

The Tax Code refers to the well-known SIC Manual for descriptions of activities that fall under the umbrella of retail trade. A copy of the relevant portions of the SIC Manual was admitted into evidence. Division G of the manual, covering retail trade, provides:

> This division includes **establishments engaged in selling merchandise** for personal or household consumption and rendering services incidental to the sale of the goods. In general, retail establishments are classified by the kind of business according to the principal lines of commodities sold (groceries, hardware, etc.), or the usual trade designation (drug store, cigar store, etc.). Some of the important characteristics of retail trade establishments are: the establishment is usually a place of business and is engaged in activities to attract the general public to buy; the establishment buys or receives merchandise as well as sells; the establishment may process its products, but such processing is incidental or subordinate to selling; the establishment is considered as retail in the trade; and the establishment sells to customers for personal or household use. Not all of these characteristics need be present and some are modified by trade practice.

(Emphasis added.)

Thus, we must determine whether Rent-A-Center is "engaged in selling merchandise" as contemplated by the SIC Manual and, if so, whether the majority of its revenues comes from such activities. The following undisputed facts are relevant: (1) one hundred percent of Rent-A-Center's merchandise is offered for sale; (2) ninety-seven percent of its merchandise, for which it receives

6

ninety percent of its revenues, is sold in an average of twenty months per item; (3) the average number of rental-purchase agreements after which any given item is ultimately sold is three; and (4) the total price that a customer must pay for a given item decreases from one rental-purchase agreement to the next for that same item due to the item's then being considered used. In short: ninety-seven percent of Rent-A-Center's merchandise, for which it receives ninety percent of its revenues, is sold in an average of twenty months.

Given these facts, the Comptroller's contention that Rent-A-Center is not primarily engaged in "retail trade" (i.e., selling merchandise) is strained. The Tax Code asks whether the revenues from Rent-A-Center's *activities* in retail trade exceed those from *activities* in other trades, but the Comptroller frames the question as asking whether Rent-A-Center's revenues from *sales* exceed its revenues from *leases*. The Comptroller relies almost exclusively on Rent-A-Center's SEC 10-K filing wherein it characterized its revenues from the rental-purchase agreements as "rentals and fees" and only a small minority of its revenues as "merchandise sales" as well as the fact the agreements refer to the arrangement as a "rental" agreement. The characterization in Rent-A-Center's 10-K is neither dispositive nor, in light of all the facts, accurate.[4] *See Destec Energy, Inc. v. Houston Lighting & Power Co.*, 966 S.W.2d 792, 794-95 (Tex. App.—Austin 1998, no pet.) (substance of transaction will generally control over its form); *see also Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisers, LLC v. United States*, 659 F.3d 466, 479 (5th Cir. 2011)

---

[4] For example, besides the 10-K, the record also contains Rent-A-Center's federal tax return for 2007 in which it identified its "business activity code" as number 453990, which is defined as "all other miscellaneous store retailers," appearing as a subcategory under the larger principal activity of "retail trade" and in which it claimed its revenues from the rental-purchase agreements on line 1 as "gross receipts or sales" rather than on line 6 as "gross rents."

(transaction's tax consequences depend on its substance rather than its form).

The Comptroller also takes issue with the use of the following terms in the rental-purchase agreements, arguing that the terms support its contention that Rent-A-Center is primarily engaged in renting: "rental," "lease," "lessor," and "lessee." However, the agreements also use terms supporting characterization of these arrangements as sales: "purchase," "consumer," "owner," and "ownership." The default occurrence, upon the customer making all specified payments under the agreement's terms, is that the customer acquires ownership of the merchandise. Rent-A-Center may not prevent the customer from acquiring ownership in this manner once the agreement is in place unless the customer breaches one of the agreement's provisions. And, while the Comptroller notes that title to the merchandise remains with Rent-A-Center at all times until the full purchase price has been paid, such fact is not inconsistent with the facts that (1) for ninety-seven percent of merchandise, title in fact *does* pass to the customer; and (2) the customer may acquire title to the merchandise *at any time* by paying the remaining cost. Undoubtedly the rental-purchase transactions are hybrids of rentals and sales. The salient question is: Are they *more* like sales or leases?

In light of the undisputed facts, we conclude that Rent-A-Center's offer of merchandise to customers under the rental-purchase agreements is more like selling than leasing and that Rent-A-Center is, therefore, primarily engaged in retail trade. We sustain Rent-A-Center's first issue and hold that the trial court erred in determining that Rent-A-Center is not entitled to a refund.

In its second issue, Rent-A-Center seeks a judgment that it is entitled to its requested cost-of-goods-sold deduction, without reduction for depreciation claimed on its federal tax return, as no statutes explicitly require such deduction. *See* Tex. Tax Code § 171.1012(b-f) (providing

8

extensive lists of includable and excludable direct and indirect costs in computing cost of goods sold). However, because it concluded that Rent-A-Center was not entitled to a refund, the trial court did not reach the issue of the amount of deduction to which Rent-A-Center is entitled and whether the amount of depreciation claimed on its federal tax return should operate to reduce its franchise-tax deduction. Accordingly, we make no determination on the issue of the amount of Rent-A-Center's deduction for cost of goods sold and remand that issue to the trial court for a factual determination in the first instance.[5]

## CONCLUSION

The trial court erred in determining that Rent-A-Center is not entitled to a franchise-tax refund. Accordingly, we reverse its judgment and render judgment that Rent-A-Center is subject to the one-half-percent franchise-tax rate for tax year 2008 and is, therefore, entitled to a refund of its overpayment. We remand this cause to the trial court for a determination of the amount of refund to which Rent-A-Center is entitled.

---

[5] We also note that, despite Rent-A-Center's representations to the contrary, we cannot glean from the record any specific stipulations by the parties about the schedules that Rent-A-Center submitted as evidence of its cost of goods sold and, therefore, we are not presented with merely a question of law on the issue of cost of goods sold. *Cf. Texas Utils. Elec. Co. v. City of Waco*, 919 S.W.2d 436, 440 (Tex. App.—Waco 1995, writ denied) (when issue to be determined is question of law, appellate court may render judgment instead of remanding case for further proceedings).

9

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Field

Reversed and Remanded

Filed:   June 11, 2015