**Michael QUEEN and Ian Magee, Appellants**

v.

**RBG USA, INC., Appellee**

**NO. 14–14–00829–CV**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed April 28, 2016

Rehearing and Rehearing En Banc Overruled July 26, 2016

Stephen J. Schechter, Boerne, TX, for appellant.

Craig D. Dillard, David Stockel, Houston, TX, for appellee.

Panel consists of Justices Jamison, McCally, and Wise

## MAJORITY OPINION

Martha Hill Jamison, Justice

These cross-appeals stem from an employment dispute. Appellants Ian Magee and Michael Queen worked for appellee RBG USA, Inc. In a purported attempt to solicit business for RBG, Magee and Queen covertly shared undisputedly confidential RBG information with another company. When Magee and Queen's supervisors learned of their actions, RBG terminated their employment. Magee and Queen contend that their actions were in the best interest of RBG and the termination of their employment was in violation of employment agreements between them and RBG. After a bench trial, the trial court rendered judgment against Magee and in favor of Queen.

Magee and Queen raise six issues challenging the legal sufficiency of the evidence in support of several trial court findings and challenging the trial court's exclusion of certain evidence. In three cross-issues, RBG challenges the legal sufficiency of the evidence in support of the trial court's judgment in favor of Queen. We affirm in part and reverse and render in part.

### Background

RBG is the United States subsidiary of RBG Limited, a company based in the United Kingdom that offers various services to the oil and gas industry, including painting and sand-blasting on offshore vessels. Magee was the country manager for RBG and hired Queen as RBG's safety director. Magee had a written employment agreement with RBG, but Queen and RBG never entered into such an agreement. Queen contends that he had an oral employment agreement but it had not been memorialized in writing at the time he left RBG.

Magee hired Neils Kastrup as a business manager. Kastrup initially reported to Magee but subsequently was promoted to regional manager for the Americas. Magee became concerned about Kastrup overstepping his authority and filed a grievance with RBG's human resources department. In response, the chief operating officer of RBG's parent company in-

structed Magee that he would now report to Kastrup as regional manager.

In the same month, Magee learned that RBG lost a two-million-dollar contract with a company called CW Technical because Kastrup did not approve of some of the language in the agreement. Magee was disgruntled about this result. Magee and Queen secretly approached a company called Surface Technology Company with a proposal for it to take over the contract with CW Technical and create a partnership with RBG to recoup the revenue lost after the deal between RBG and CW Technical did not proceed. Magee and Queen met with the president of Surface Technology, Chris Hionides, in New Orleans to discuss the proposal. Magee provided Hionides with a proposed agreement, which included RBG's profit margin rates, labor rates, and equipment list.

Marlin Lester, another employee at RBG, told Kastrup that Magee and Queen were planning to leave RBG to partner with Surface Technology and provided confidential RBG information to Hionides. Kastrup emailed Magee, Queen, and another RBG employee to set up an "operational review" meeting. The meeting was actually a disciplinary hearing. At the hearing, Magee initially denied traveling to New Orleans and denied having met Hionides. Then, Magee admitted he traveled to New Orleans but only for a job interview, and he said he did not give any information to Surface Technology and did not know of the company. The same day, Kastrup sent letters to Magee and Queen terminating their employment for "gross misconduct" for sharing confidential information in violation of RBG company policy.

Under the terms of Magee's employment contract with RBG, Magee was required to abide by RBG's disciplinary rules and procedures. RBG was entitled to terminate Magee's employment "without notice in the event of gross misconduct." RBG's written "Disciplinary and Dismissal Procedure[s]" governed dismissal of RBG employees. Under these procedures, RBG agreed to take no disciplinary action against an employee without a full investigation "into the circumstances of the alleged offen[s]e." However, an exception to this policy allowed "instant and summary dismissal" as follows:

> When there is a threat to the well-being of [RBG] or to employees and the most appropriate course of action would be instant dismissal, the Business Director may implement this providing he is fully satisfied of the facts of the case and has agreement from the HR manager. Providing circumstances permit, the employee must be seen before this decision is taken and be given the opportunity to explain his/her involvement. Instant dismissal may be with or without notice depending on the nature of the offense.

RBG reserved "the right to effect summary dismissal [without notice] in certain serious circumstances of gross misconduct," which included, as relevant here, "[d]ivulging confidential information to a third party" and "dishonesty."

Magee and Queen brought claims against RBG for breach of contract, quantum meruit, and libel. RBG filed counterclaims for breach of contract and money had and received against Magee for failure to repay funds purportedly advanced to Magee for the purchase of a car and a bonus that was mistakenly paid to Magee. The trial court granted directed verdicts on the libel claims and rendered judgment in favor of RBG on Magee's breach of contract claim, Queen's quantum meruit claim, and RBG's claims against Magee. The trial court rendered judgment in favor of Queen on his breach of contract claim.

## Discussion

Magee and Queen challenge the legal sufficiency of the evidence in support of the trial court's (1) judgment against Magee on his breach of contract claim and in favor of RBG on its breach of contract and money had and received claims; (2) limitation of Queen's damages to three months' pay; and (3) failure to award Queen certain attorney's fees. Magee and Queen also complain of the trial court's exclusion of evidence regarding Magee's health and employment benefits. RBG challenges the legal sufficiency of the trial court's judgment in favor of Queen. We conclude there is legally insufficient evidence to support a portion of the trial court's judgment in favor of RBG and to support the trial court's judgment in favor of Queen.[1]

▆▆▆ When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair minded person to find the fact under review. *Id.* The factfinder

is the sole judge of witnesses' credibility and the weight to be given their testimony. *See id.* at 819. We will conclude that the evidence is legally insufficient to support the finding only if (1) there is a complete absence of evidence of a vital fact, (2) we are barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810.

▆▆▆ In a bench trial, the trial court's findings of fact have the same weight as a jury's verdict. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *Approximately $1,013.00 v. State,* No. 14–10–01255–CV, 2011 WL 5998318, at *3 (Tex.App.–Houston [14th Dist.] Dec. 1, 2011, no pet.) (mem. op.). When the trial court did not issue findings of fact, as here, we must imply all findings of fact necessary to support the judgment. *Black v. Dallas Cnty. Child Welfare Unit,* 835 S.W.2d 626, 630 n. 10 (Tex.1992); *Nat'l Cas. Co. v. Charlie Hinds Paint & Body, Inc.,* 434 S.W.3d 254, 258 (Tex.App.–Houston [1st Dist.] 2014, no pet.). However, we may consider findings of fact recited in the judgment when they are not supplanted by separate findings.[2]

---

1. Because of these conclusions, we do not reach (1) Magee and Queen's issues challenging the trial court's three-month limitation of damages on Queen's claims and complaining of the attorney's fees award and the trial court's exclusion of evidence regarding Magee's health and employment benefits, and (2) RBG's cross-issue challenging the legal sufficiency of the evidence supporting the trial court's award of attorney's fees in favor of Queen.

2. Magee and Queen complain in their response to RBG's cross-appeal that the trial court did not issue findings of fact and conclusions of law. However, they do not seek abatement of the appeal. *See Acad. Corp. v.*

*Interior Buildout & Turnkey Const., Inc.,* 21 S.W.3d 732, 739 n. 1 (Tex.App.–Houston [14th Dist.] 2000, no pet.) ("[I]f harm is shown by the court's failure to issue findings of fact and conclusions of law, the appropriate remedy is to abate the appeal and direct the trial court to correct its error."). We may not grant relief that an appellant does not request. *See In re S.K.H.,* 324 S.W.3d 156, 159 (Tex.App.–El Paso 2010, no pet.). Because Magee and Queen do not pray for an abatement, we cannot grant them any relief. *See id.* Moreover, they did not properly preserve this issue by raising it as an appellate issue or cross-issue, and thus, it is waived. *See Fisher v. Roper,* 727 S.W.2d 78, 81 (Tex. App.–San Antonio 1987, writ ref'd n.r.e.).

*Approximately $1,013.00,* 2011 WL 5998318, at *3.

The trial court made the following findings, in pertinent part, in its final judgment:

- *Claims asserted by Magee*: "Magee was justifiably terminated by RBG in accordance with the terms of his employment contract and RBG's disciplinary policies" on the basis of "gross misconduct" by divulging confidential information to Surface Technology and dishonesty. RBG was entitled to summarily dismiss Magee.

- *Claims asserted by Queen*: Queen had "an oral contract of employment similar in nature to Magee's written employment contract." Queen's actions "regarding the trip to New Orleans and providing confidential company information to Surface Technologies [sic] were performed with the approval of Magee." Thus, they "do not constitute gross misconduct allowing RBG to institute instant and summary dismissal." As a result, Queen was not provided proper notice of his termination in accordance with his oral employment contract and RBG's disciplinary policies. However, Queen's oral employment contract included a three-month notice of termination term similar to Magee's contract, permitting termination without cause with three months' written notice. Queen was provided such notice and is "entitled to damages constituting three ... months['] salary following notice of his termination in accordance with

the terms of his oral employment contract."

- *Claims asserted by RBG*: The Court found in favor of RBG on its breach of contract claim and money had and received claim against Magee "for the purchase of a car for Magee's wife and a mistakenly-paid bonus payment, neither of which were paid back to RBG by Magee."

### I. Repayment of Funds

In their first issue, Magee and Queen challenge the legal sufficiency of the trial court's findings in favor of RBG on its breach of contract and money had and received claims against Magee, specifically, that Magee was required to repay RBG for the purchase of his wife's car and that Magee failed to reimburse RBG for a bonus overpayment. We note as an initial matter that RBG had the burden of proof on its counterclaims against Magee. *See Hartis v. Century Furniture Indus., Inc.,* 230 S.W.3d 723, 730 (Tex.App.–Houston [14th Dist.] 2007, no pet.). So RBG was required to present some evidence that Magee was required to repay the disputed funds.

Magee and Queen argue that the only evidence regarding these issues was Magee's testimony denying that he had to repay RBG for the purchase of the car and stating he "thought" he had repaid the bonus. We agree that Magee's testimony is insufficient to support the trial court's finding that Magee was required to repay the money to purchase the car. We cannot similarly conclude, however, that the evidence is legally insufficient to support the trial court's finding that Magee did not repay the bonus overpayment.[3]

---

**3.** Kastrup testified during his videotaped deposition that was played at trial that RBG advanced a $36,672.81 loan to Magee for the purchase of a vehicle, "the intent was for Magee to pay that back through future bonus-

es," the money had not been paid back to RBG, Magee also was mistakenly paid a bonus payment that he was required to repay, and $2,065.69 was outstanding when Magee left RBG. However, the trial court sustained

■ **Funds Used to Purchase Vehicle.** Magee testified on direct examination, "They [RBG] said I ... owed them funds for a vehicle," but Magee "thought it was like a signing on bonus." He also testified that RBG had not made a demand for payment before bringing its cross-claim.

RBG argues that Magee admitted RBG "advanced" him the money to purchase the car, but the context of that testimony shows that Magee did not admit he had to repay the funds:

> [RBG's counsel:] You do recall RBG advancing you $36,872.81 for the purchase of a car, right?
>
> [Magee:] Yes....
>
> [RBG's counsel:] Was that a car for your wife?
>
> [Magee:] It was, yes.
>
> [RBG's counsel:] And you paid that in advance ... for the purchase of the vehicle; is that right?
>
> [Magee:] No, RBG did.
>
> [RBG's counsel:] And you have not repaid RBG any of that amount, right?
>
> [Magee:] *I was told I didn't have to.*

(Emphasis added.)

■ "[E]vidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did." *City of Keller,* 168 S.W.3d at 812; *see also Serv. Corp. Int'l v. Guerra,* 348 S.W.3d 221, 229 (Tex.2011) (noting that testimony elicited during direct and cross-examination must be considered in context). Although Magee answered affirmatively when RBG's counsel used the word "advancing," Magee then stated that he was not required to repay RBG. No other evidence was admitted at trial regarding these funds. The trial court, as the sole judge of the credibility of the evidence,

was entitled to disbelieve Magee, but RBG still was required to present some evidence that Magee was required to pay back the disputed funds. *See City of Keller,* 168 S.W.3d at 819, 827. We conclude that using the word "advancing" in a cross-examination question, when considered in the context of the cross-examination, is not evidence that Magee was required to repay RBG. Thus, the trial court's finding on this issue is not supported by legally sufficient evidence.

■ **Bonus Overpayment.** Magee admitted that he was supposed to reimburse RBG for the bonus overpayment through payroll deductions. He testified that he "thought" he had repaid it, but did not present any evidence that he actually had. Payment is an affirmative defense for which the defendant bears the burden of proof. *See Roberts v. Roper,* 373 S.W.3d 227, 233 (Tex.App.–Dallas 2012, no pet.) (discussing affirmative defense of payment in context of summary judgment); *see also* Tex. R. Civ. P. 94, 95 (establishing payment as an affirmative defense and precluding defendant from proving payment without providing an accounting). A defendant asserting the affirmative defense of payment must present evidence of the offsets or credits claimed by the debtor. *See Roberts,* 373 S.W.3d at 233. Here, Magee merely said that he "thought" he repaid the bonus overpayment. Accordingly, he did not present any evidence to support his affirmative defense of payment. *See id.* The trial court's finding in favor of RBG on this issue is supported by legally sufficient evidence because it is undisputed that Magee owed RBG these funds and Magee did not establish that he repaid RBG.

Magee's counsel's objection to this testimony based on lack of personal knowledge and hearsay. RBG does not complain of this ruling on appeal.

We sustain Magee and Queen's first issue as to the funds used to purchase the vehicle, but overrule the issue as to the bonus overpayment.

## II. Findings on Termination for Gross Misconduct

In their third and fourth issues, Magee and Queen challenge the legal sufficiency of the trial court's findings that Magee was justifiably terminated by RBG for gross misconduct in accordance with the terms of his employment contract and RBG's disciplinary procedures. Magee and Queen argue that Magee was entitled to a full investigation under RBG's disciplinary procedures and notice of a disciplinary meeting, but Magee and Queen concede that Magee was not entitled to these procedures in the event of the need for instant and summary dismissal. RBG could effect instant and summary dismissal without notice for gross misconduct, including but not limited to divulging confidential information to a third party or dishonesty. Accordingly, if there is evidence supporting the trial court's finding that Magee engaged in gross misconduct, then RBG was not required to conduct a full investigation or provide notice before terminating Magee.

Magee conceded at trial that he divulged confidential information to Hionides at Surface Technology via email. The email was admitted at trial. Magee attached a document to the email that contained, in Magee's words, "a breakdown of how [RBG] calculate[d its] labour and jobs." John McLeish, RBG's former Group Human Resources Director, testified that the materials provided to Surface Technology included information about a specific job for a client of RBG and that information should not have been shared with another party besides the client. The attachment also included "cost estimates relating to mobilization of labor, ... equipment ... pricing and materials." McLeish testified that such information is confidential and sharing it with Surface Technology "very clearly" constituted gross misconduct. Kastrup and Hionides also testified that the information shared with Surface Technology is confidential.

Magee and Queen argue that Surface Technology was not a competitor of RBG and thus Magee did not engage in gross misconduct because he was required to share confidential information with a potential partner.[4] No such exception is contained in RBG's disciplinary procedures—it lists "[d]ivulging confidential information to a third party" as an example of gross misconduct. The parties easily could have included the word "competitor" in lieu of "third party" in their contract if they so intended. We may not rewrite the employment agreement or add terms not included by the parties. *See Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 641 (Tex.App.–Houston [14th Dist.] 2005, no pet.). Magee asserts, however, that being terminated for purportedly "doing [his] job" made the limitation on at-will employment in his employment contract illusory. When an employment contract provides that an employer may terminate an employee "for cause," the contract is not illusory. *See Wood v. Reserve First Partners, Ltd.*, No. 09–06–217 CV, 2007 WL 2199901, at *3 (Tex.App.–Beaumont Aug. 2, 2007, no pet.) (mem. op.). Whether Magee was dismissed for cause—or was merely "doing his job"—was a fact question for the factfinder to determine.

Magee also conceded at trial that he engaged in dishonesty. In the disciplinary meeting, he at first denied being in New

4. RBG presented testimony at trial that Surface Technology was, in fact, a competitor.

Orleans for the meeting with Hionides. Then, he said he was there alone for a job interview, when he actually was there with Queen. He also denied making contact with or knowing Hionides. Magee admitted at trial that the meeting with Hionides took place, he and Queen were in attendance, and it was not a job interview.

We conclude that legally sufficient evidence supports the trial court's finding that Magee engaged in gross misconduct based on divulging confidential information to a third party and dishonesty. Accordingly, RBG was entitled to summarily dismiss Magee without notice in accordance with its disciplinary procedures.

We overrule Magee and Queen's third and fourth issues.

### III. Issues Relating to Judgment in Favor of Queen

■■■ In its cross-appeal, RBG challenges the legal sufficiency of the evidence in support of the trial court's finding that Queen and RBG entered into an oral employment agreement, altering Queen's at-will employment status and entitling him to three months' notice of termination, and challenges the legal sufficiency of the evidence in support of the trial court's award of damages. We conclude that Queen did not meet his burden to overcome the presumption that his employment with RBG was at-will at the time his employment was terminated.

■■■ Employment in Texas is presumed to be at-will. *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502–03 (Tex.1998); *Dworschak v. Transocean Offshore Deepwater Drilling, Inc.*, 352 S.W.3d 191, 196 (Tex.App.–Houston [14th Dist.] 2011, no pet.). This presumption is difficult to overcome, and an employer's modification of the at-will employment status must be express and cannot be implied. *Price v. Tex. Alcoholic Bever-*

*age Comm'n*, No. 01–12–01164–CV, 2014 WL 3408696, at *9 (Tex.App.–Houston [1st Dist.] July 10, 2014, pet. denied) (mem. op.) (citing *Trostle v. Combs*, 104 S.W.3d 206, 211 (Tex.App.–Austin 2003, no pet.) and *Byars v. City of Austin*, 910 S.W.2d 520, 523 (Tex.App.–Austin 1995, writ denied)): "[A]bsent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will for good cause, bad cause, or no cause at all." *Brown*, 965 S.W.2d at 502. To alter the at-will employment status, "the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances." *Id.* In that connection, any such agreement must provide in a "special and meaningful way" that the employer does not have the right to terminate the employee's employment at will. *Durckel v. St. Joseph Hosp.*, 78 S.W.3d 576, 581–82 (Tex.App.–Houston [14th Dist.] 2002, no pet.). It is the employee's burden to prove that the employer expressly, clearly, and specifically agreed to modify the employee's at-will employment status. *Burkett v. Ulrich Barn Builders, LLC*, No. 10–11–00392–CV, 2012 WL 851665, at *5 (Tex.App.–Waco Mar. 21, 2012, no. pet.) (mem. op.); *see also Dworschak*, 352 S.W.3d at 196.

Magee testified that he hired Queen to be on the senior management team at RBG. RBG had a qualifying period of "maybe about a month or so" before offering its employees employment agreements. Magee could not remember how long the qualifying period was. Magee testified that after that period, Queen would have been "operating under an employment contract[.]" Queen worked at RBG for approximately six months. However, it is undisputed that Queen had not received a written employment agreement before his employment was terminated. According

to Magee, the terms of Queen's contract "would be similar to my own contract but written to suit U.S. terminology."[5] Magee stated that Queen would be covered by RBG's "disciplinary and dismissal procedures."[6] Magee did not think Queen was an at-will employee.[7] The former human resources director of RBG's parent company admitted that Magee had the authority to hire Queen and offer him a contract.

Gay Smith, RBG's former human resources manager, testified that she did not consider Magee and Queen to be at-will employees "in that they were under an employment contract or *should have been* under an employment contract." (Emphasis added.) In response to the question, "Why do you say [Queen] should have been under an employment contract," Smith responded, "Because at the time that Mr. Queen was hired [sic], the contract was in review under revisions at [the law firm] Boyar Miller." Smith never saw the contract because Kastrup held it up to change the terms of the termination procedures, which would require RBG to give a six months' termination notice in lieu of three. Smith said it was her "understand-ing" that the human resources department would have to conduct an investigation before terminating Queen's employment.

Queen testified that he thought he was supposed to receive a written employment agreement within 30 days of being hired, but he did not receive the contract because "it was being held up by the attorneys for a rewrite." Queen further testified it was his "understanding that RBG could not terminate [him] unless they followed [the disciplinary and dismissal] procedure[s]." On direct examination, however, Queen noted that he did not see the disciplinary and dismissal procedures until after he left RBG: "To be quite honest with you, I don't recall ever signing [the procedures] in the first place, and I did see [them], but it was after the fact." After the termination of his employment, RBG sent Queen a letter stating, "You are entitled to appeal against termination of your contract in terms of the Disciplinary and Dismissal Procedure."

RBG does not dispute that it was in the process of drafting an employment agreement for Queen when he left RBG. Howev-

---

5. Magee's contract was drafted in the United Kingdom and included terms relating to his relocation from there to the U.S. It is unclear from the record, however, what Magee meant by the difference between U.K. and U.S. terminology. Magee further conceded on cross-examination that there were differences between the two employment agreements: "With the exception of the U.K. language that's in there, it would have to be U.S., their language, and the bonus structure may be different." Magee estimated Queen's salary to be "[c]irca a hundred thousand," and he believed but did not know that RBG gave Queen a car allowance. Queen later testified that he was entitled to $650 a month for a car allowance, but presented his 2008 tax return as evidence of his salary. He only worked part of that year and did not remember whether he received a bonus as part of his salary reported on his tax return.

6. As set forth above, under the terms of Magee's employment contract with RBG, RBG's written "Disciplinary and Dismissal Procedure[s]" governed dismissal of RBG employees. Under these procedures, except in instances allowing instant and summary dismissal, RBG was required, among other things, to conduct a full investigation and give notice before taking disciplinary action against an employee.

7. Magee and Queen's attorney elicited the following testimony from Magee on direct examination:

Q Because of Mr. Queen's position, was he an at-will—could you just fire him?
A I don't think so, no.... You'd have to go through a procedure.
Q And that procedure is in the disciplinary and dismissal?
A Yes.

er, to overcome the presumption of employment at-will, Queen was required to present evidence that RBG had "unequivocally indicate[d] a definite intent to be bound not to terminate [Queen] except under clearly specified circumstances." *See Brown,* 965 S.W.2d at 502; *see also id.* at 503 ("It would be unusual . . . for oral assurances of employment for an indefinite term to be sufficiently specific and definite to modify an at-will relationship."). The testimony elicited at trial amounted to the belief that Queen should no longer have been an at-will employee during a time period after an unspecified "qualifying period" but before the written employment agreement was finalized. Beliefs are not evidence. *In re A.L.H.,* 468 S.W.3d 738, 747 (Tex.App.–Houston [14th Dist.] 2015, no pet.) ("A witness's belief is no more than mere surmise or suspicion, which is not the same as evidence.").

 Magee had the authority to offer Queen a contract, but his testimony that he did not "think" Queen was still an at-will employee after an indefinite period of time does not overcome the presumption of at-will employment. *See id.* Likewise, Smith's belief that Queen "should have been" under contract, along with the admission that his employment contract was still being drafted, does not show that Queen was no longer an at-will employee when he left RBG. *See id.* In fact, Smith admitted that some of the very terms addressing RBG's termination procedures were still being negotiated. To be enforceable, an agreement to agree, like any other contract, must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations. *Fischer v. CTMI, L.L.C.,* 479 S.W.3d 231, 237 (Tex.2016). As Queen seeks to establish that the parties modified the at-will employment relationship, the termination notice required under the purported agreement is a material term. *See Brown,* 965 S.W.2d at 502 (requiring evidence that employer intended not to terminate employment "except under clearly specified circumstances"); *see also T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992) ("Each contract should be considered separately to determine its material terms.").

The dissent asserts that Queen adduced legally sufficient evidence of the material terms of the parties' "agreement to agree" based largely on Magee's testimony. But none of the cases cited by the dissent address the evidence required to establish an employer's intent to alter the strong presumption of at-will employment. Magee's equivocal testimony that he believed Queen was no longer an at-will employee at some point after his being hired and that Queen's oral employment contract was "similar" to his but not the same does not reflect the express, clear, unequivocal, and specific intent required to alter the at-will employment status.

Queen's admission that he never received a written contract, opinion that he thought RBG could not terminate him without following the disciplinary and dismissal procedures, and admission that he did not see those procedures until after he left RBG similarly do not support a finding that the at-will relationship had been modified. *See In re A.L.H.,* 468 S.W.3d at 747 ("Unsupported, conclusory opinions of a witness do not constitute evidence of probative force."). Finally, RBG's offer after the fact to allow Queen to appeal the termination decision does not create an employment contract. *See Brown,* 965 S.W.2d at 503–04 (holding that employer's oral assurances that an employee whose work is satisfactory will not be terminated without good cause were too indefinite to constitute oral employment agreement). The dissent posits, though, that RBG's ac-

tions in terminating Queen's employment indicate that his at-will employment status had been altered. However, we may not infer an agreement to alter Queen's at-will employment status: Queen was required to present evidence of an express agreement. *See id.* at 502 ("An employee who has no formal agreement with his employer cannot construct one out of indefinite comments, encouragements, or assurances."); *see also Byars,* 910 S.W.2d at 523 ("Any modification of at-will employment status must be based on express rather than implied agreements.").

Despite indulging every reasonable inference in the record to support the trial court's findings, we conclude that Queen did not present legally sufficient evidence to overcome the strong presumption of at-will employment. Specifically, he has not demonstrated that RBG unequivocally expressed before the termination of his employment "a definite intent to be bound not to terminate [him] except under clearly specified circumstances." *See Brown,* 965 S.W.2d at 502; *see also Durckel,* 78 S.W.3d at 582 ("General statements about working conditions, disciplinary procedures, or termination rights are not sufficient to change the at-will employment relationship; rather, the employer must expressly, clearly, and specifically agree to modify the employee's at-will status."). Accordingly, Queen did not establish that his presumed at-will relationship with RBG had been altered before he left the company. *See Durckel,* 78 S.W.3d at 582.

Magee and Queen contend that RBG is implicitly arguing that evidence of the oral employment agreement is barred by the statute of frauds. Because RBG did not plead the statute of frauds, Magee and Queen assert that RBG waived that affirmative defense. *See* Tex. R. Civ. P. 94. We do not interpret RBG's argument as a challenge to the agreement not being in writing. RBG challenges the legal sufficiency of the evidence establishing the essential terms of the agreement. Magee and Queen also argue that RBG is estopped from challenging the existence of the oral employment agreement because RBG delayed providing the written agreement to Queen. But it was Magee and Queen's burden to overcome the presumption of at-will employment as to Queen, which Magee and Queen failed to do. Finally, they assert that an agreement to modify an employee's at-will employment status can be oral or in writing. Assuming without deciding that they are correct, they did not present legally sufficient evidence to establish that RBG agreed to alter the at-will nature of its relationship with Queen. *See Brown,* 965 S.W.2d at 503 ("It would be unusual ... for oral assurances of employment for an indefinite term to be sufficiently specific and definite to modify an at-will relationship.").

We sustain RBG's first cross-issue.

### Conclusion

We reverse the judgment in favor of RBG as to the funds given to Magee to purchase a car and render judgment that RBG take nothing by way of that claim. We reverse the judgment in favor of Queen on his breach of contract claim and render judgment that Queen take nothing on that claim. We affirm the judgment of the trial court in all other respects.

(McCally, J., dissenting).

Sharon McCally, Justice, dissenting.

The Majority Opinion reverses, finding legally insufficient evidence that Queen had an oral employment contract with RBG, notwithstanding direct evidence that Queen's authorized supervisor offered Queen the employment contract and that Queen was terminated for failing to follow the terms of that employment contract.

The trial court, as fact finder,[1] believed that Queen adduced sufficient evidence to establish that Queen and RBG had a meeting of the minds and, thus, concluded that Queen had an oral contract of employment with RBG.[2] I would affirm on that point. Because the Majority does not, I respectfully dissent.

## I. Introduction

The Majority holds that Queen failed to overcome the presumption of at-will employment. I agree with the Majority that to overcome the presumption, Queen needed to establish that RBG unequivocally indicated "a definite intent to be bound not to terminate the employee except under clearly specified terms." Maj. Op. at 12–13 (citing *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex.1998)). I do not agree that the fact finder had insufficient evidence to conclude Queen met that burden. Moreover, I do not believe the Majority applies an appropriately deferential standard in reviewing the trial court's fact findings, explicit and implicit. Viewing the evidence in the light most favorable to the fact finder's determination, as we must, there is ample evidence to overcome the presumption of an at-will relationship between Queen and RBG.

## II. There is ample evidence that the parties altered Queen's at-will status.

The Majority concludes that Queen's subjective "belief" that he was not an at-will employee is insufficient evidence to support the finding of oral contract. Maj. Op. at 15. However, the Majority errs in its failure to acknowledge the ample evidence of the parties' mutual actions that demonstrate a departure from an at-will employment status. We must determine whether the parties had a meeting of the minds to alter the at-will relationship based upon an objective standard of what the parties said and did rather than on their subjective state of mind. *See Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 556 (Tex.App.–Houston [14th Dist.] 2002, no pet.) (noting that, to determine mutual assent, the court should "consider the communications between the parties and the acts and circumstances surrounding those communications").

The Majority does not acknowledge the evidence the trial court may have believed and inferences the trial court may have indulged that (A) RBG [Neils Kastrup] acknowledged the specific terms of Queen's "contract" when it terminated Queen; (B) RBG terminated Queen for violating "the contract" they now disavow[3]; and (C) RBG resorted to "the contract" for termination policies and procedures when they terminated Queen.

### A. RBG acknowledged Queen's oral contract

RBG Country Manager Ian Magee unambiguously testified that he offered Queen a contract:

---

1. "Where a meeting of the minds is contested, ... determination of the existence of a contract is a question of fact." *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.–Houston [14th Dist.] 2000, no pet.). "If the factfinder determines that one party reasonably drew the inference of a promise from the other party's conduct, that promise will be given effect in law." *Id.* (citing *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex.App.–San Antonio 1999, pet. denied).

2. Although the trial court did not set forth all of the terms of the "oral contract" it found to exist, the court determined that Queen's oral employment agreement was similar in nature to Magee's own written employment agreement ("the Magee model agreement").

3. RBG even asserted in their answer to Queen's lawsuit that his oral contract claim was barred by his "prior material breach."

Q. Mr. Queen reported directly to you?

A. Yes.

Q. You're the one who hired him?

A. Yeah.

Q. Did you have the authority to hire him?

A. Yes.

Q. Did you offer him a contract?

A. Yes.

In Kastrup's November 14, 2008 termination letter, he states that Queen is "entitled to appeal against termination of *your contract* in terms of the Disciplinary and Dismissal Procedure." (emphasis supplied) The Magee model agreement shows that RBG intends that an employee's "acceptance of this contract indicates that you abide by the disciplinary rules."

## B. RBG terminated Queen for not following his oral contract

RBG Group Human Resources Manager John McLeish also testified that Queen's termination was categorized as "gross misconduct" for disclosing confidential information. Again, the Magee model agreement shows explicitly, under Disciplinary & Dismissal Procedure, that "divulging confidential information to a third party" is one example of gross misconduct for which the right of "Summary Dismissal" is contractually reserved to RBG. It further states, under Confidentiality, that "[e]mployees must not divulge 'confidential information' which they may receive or obtain in the course of their employment, either during that employment or at any time thereafter" and "[a]ny contravention of this [policy] will be viewed as gross misconduct."

## C. RBG followed Queen's oral contract

RBG followed Queen's oral contract in all of its essential terms [4]: term of employment; termination procedures; and compensation.

### 1. Term of Employment and Termination Procedures

With regard to the parties' agreement on term of employment, Magee testified that the term of Queen's contract was "open-ended" with a retirement age of 65, just like Magee's contract. Gay Smith of RBG Human Resources explained that an open-ended contract is one based upon assignment, not time.[5] She also explained that under the open-ended "term" of such a contract, RBG may only terminate in accordance with the company's notice of termination provisions. That is, RBG could terminate immediately and without the necessity of notice in the event of gross misconduct. Otherwise, the company was required to give three months' written notice of termination. McLeish explained that the open-ended contract of employment is "the norm" for employment contracts at RBG.

RBG performed. In keeping with the "term of employment" and the "termi-

---

4. It is true, as RBG alleges, that Queen and RBG did not agree on "the amount of work Queen was obligated to perform." There is no evidence that Magee and Queen specifically discussed whether Queen was to be a part-time or a full-time employee. In light of the fact that RBG placed Queen in charge of safety, it seems that a full-time job could be implied from the title. However, and more to the point, the trial court could have examined the Magee model agreement and concluded that such a term is not material to RBG. The Magee model agreement makes no reference to the "amount" of work. Instead, it explicitly states that he must "work such hours as may be necessary for the performance of [his] duties."

5. RBG did not assert that the oral contract of employment urged by Queen violated the statute of frauds and does not make that argument on appeal.

nation" terms of the contract, RBG notified Queen on November 14, 2008, in writing that he was being summarily and immediately terminated for gross misconduct and that he had a right of appeal. Kastrap testified that he specifically followed the contractual procedures in terminating Queen.

### 2. Compensation

With regard to the parties' agreement on compensation, Magee said Queen's salary was "specified" at the time he and Queen discussed the contract and his recollection was that the salary was "circa $100k." Further, Magee and Queen testified they agreed on additional compensation, a $650 per month car allowance.

And, RBG performed. RBG paid Queen "circa $100,000" or precisely $126,442.40 as compensation. And, RBG paid Queen precisely $650.00 per month as a car allowance until it terminated him.

From the above evidence of RBG's acknowledgement of the contract, compliance with the contract, and allegation that Queen breached the contract, the trial court could easily have determined that both parties objectively acted as though Queen was bound by the contract he was offered and he accepted; and that RBG knew that it was bound by a contract. At-will employees may be fired for any reason or no reason at all; neither gross misconduct nor three-month's written notice are required. *See Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 660 (Tex.2012) (noting that "we have long held firm to the principle that, in Texas, an at-will employee may be fired for a good reason, a bad reason, or no reason at all") (internal citations omitted). The trial court was entitled to consider RBG's conduct and its adherence to these non-at-will terms in determining that RBG agreed that Queen would not be an at-will employee.

### III. There is ample legal authority that Queen's employment contract was not an unenforceable agreement to agree.

The Majority repeatedly references the anticipated, but unexecuted, written employment agreement. Thus, the Majority appears to conclude that Queen's initial agreement with RBG did not rise beyond an unenforceable "agreement to agree." Maj. Op. at 16. If so, the Majority has neglected not only the ample evidence of "performance," detailed above, but also the ample legal authority on agreements to agree.

An agreement to formalize an agreement later does not render such agreement unenforceable. In 1988, the Texas Supreme Court held that a determination whether a "contemplated formal document [was] a condition precedent to the formation of a contract or merely a memorial of an already enforceable contract" rests upon the intent of the parties; and intent of the parties is a fact question. *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 745 (Tex.1988). Very recently, the Texas Supreme Court reaffirmed that holding. *See R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559 (2016). Relying upon *Foreca*, our court has also acknowledged that whether a contemplated formal document is in the nature of a condition precedent to an enforceable contract or is to be a memorial of an already enforceable contract is a question of intent; and where intent is disputed, it is a fact question. *See Martin v. Black*, 909 S.W.2d 192, 197 (Tex.App.–Houston [14th Dist.] 1995, writ denied).

Even a somewhat indefinite agreement to agree may be enforced where the parties have performed or partially performed. Recently in *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231 (Tex.2016), Justice

Boyd, writing for a unanimous court, detailed the principles of agreements to agree. Following a bench trial in *Fischer*, the trial court declared that the 2010 adjustment provision contained within the parties' asset purchase agreement was not an unenforceable agreement to agree. *Id.* at 244. CTMI contended that the provision was an agreement to agree in part because the provision stated that the completion percentages "will have to be mutually agreed upon." *Id.* at 236. The Dallas Court of Appeals reversed the trial court, holding the provision "an unenforceable agreement to agree"; one that "fails for 'indefiniteness' as a matter of law." *Id.* at 237.

The Supreme Court noted as the Majority does here, that all material and essential terms must be agreed upon before an agreement to agree may be enforced. *Id.* at 238. However, the Supreme Court also noted that " '[a]greements to enter into future contracts are enforceable if they contain all material terms.'" *Id.* (alteration in original) (quoting *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex.2013)). Stated differently, "an agreement that contains all of its essential terms is not unenforceable merely because the parties anticipate some future agreement." *Id.*

The *Fischer* court then analyzed the language before the court to determine whether the language "will have to be mutually agreed upon" rendered the provision too indefinite to enforce. *See id.* at 242–44. The *Fischer* court returned to the familiar principles of the Restatement (Second) of Contracts[6] for its analysis: "[W]e are guided by the principle that '[p]art performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.'" *Id.* at 240 (quoting Restatement (Second) of Contracts § 34(2) (1981)). Therefore, the court examined the parties' performance under the agreement and found substantial performance on the asset purchase agreement as a whole, though not on the adjustment provision. *See id.* at 244. Nevertheless, the court determined that "[w]hen parties have already rendered some substantial performance or have taken other material action in reliance upon their existing expressions of agreement, courts will be more ready to find that the apparently incomplete agreement was in fact complete and require ... performance on reasonable terms." *Id.* at 242 (quotation omitted).

Queen's argument for enforcement is even better than *Fischer*. Queen adduced evidence of the essential terms of his oral employment agreement, in particular from the supervisor who offered him that agreement. Queen adduced evidence that RBG itself performed under that agreement. RBG's performance was not merely on the agreement as a whole. RBG performed on the very provision that rendered this employment contract not at-will. RBG knew that it agreed to give Queen three months' notice unless it terminated him for gross misconduct. And, so, RBG terminated Queen for gross misconduct.

---

6. *Fischer* is not decided in the context of an employment contract; however, the Texas Supreme Court frequently resorts to the Restatement (Second) of Contracts for employment-contract guidance. For example, in the seminal case relied upon by the Majority, *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex.1998), the court used the Restatement (Second) of Contracts to define "promise" between employer and employee. And, in *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 661 (Tex. 2006), the court used the Restatement (Second) of Contracts to examine covenants not to compete within employment contracts.

Having failed to persuade the trial court that Queen engaged in gross misconduct, RBG now pretends the contract does not exist. On appeal, RBG has persuaded the Majority to allow them to have their contract and reject it, too—as a matter of law. But, the Majority has disregarded a fundamental characteristic of agreements to agree that are themselves enforceable: The parties' actions are conclusive evidence of their intent to be bound even to the agreement to agree. *See Tex. Oil Co. v. Tenneco, Inc.*, 917 S.W.2d 826, 830 (Tex. App.–Houston [14th Dist.] 1994) ("[T]he actions of the parties may conclusively establish their intention to enter a binding agreement even if some terms are left for future agreement."), *rev'd on other grounds*, 958 S.W.2d 178 (Tex.1997); *see also* Restatement (Second) of Contracts § 33 cmt. a ("[T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon."). The trial court resolved RBG's intent to be bound to the oral contract of employment from RBG's own words and conduct.

Because I believe the trial court's determination that Queen and RBG had an oral employment contract is abundantly supported by the evidence, I would affirm the trial court's finding of an oral employment contract between Queen and RBG that required RBG to give Queen three-months' notice of termination in the absence of gross misconduct.