**Affirmed and Opinion filed August 31, 2021.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-19-00358-CV
_____

**GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS; AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS, Appellants**

**V.**

**XEROX CORPORATION, Appellee**

**On Appeal from the 201st District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-17-003974**

## O P I N I O N

In this franchise-tax dispute, the taxable entity paid franchise taxes under protest and brought suit asserting that the franchise tax rate applicable to the entity during Report Years 2008 and 2009 was 0.5% rather than 1.0%. The Comptroller

of Public Accounts of the State of Texas and the Attorney General of the State of Texas counterclaimed, asserting that the taxable entity's cost-of-good-sold deduction should have been less than the amounts reported by the entity in each of these years. The trial court ruled in the taxable entity's favor on its claims and ordered that the defendants take nothing on their counterclaims. On appeal, the defendants assert that the trial court erred in determining that the applicable franchise tax rate during the time period at issue was 0.5% rather than 1.0% and that the trial court erred in rendering a take-nothing judgment on their counterclaim. We affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Following an audit, appellant/defendant Glenn Hegar, the Comptroller of Public Accounts of the State of Texas (the "Comptroller") determined that the applicable franchise tax rate for appellee/plaintiff Xerox Corporation for Report Years 2008 and 2009 (the "Time Period at Issue") was 1.0% rather than 0.5%. Xerox had used the 0.5% tax rate to compute its franchise tax during the Time Period at Issue because Xerox contended that it was primarily engaged in wholesale trade under Texas Tax Code section 171.002(c) during this time period. The Comptroller disagreed with this contention. In June 2017, the Comptroller assessed more than $2.1 million against Xerox in franchise tax and interest for Report Year 2008 and more than $2.2 million in franchise tax and interest for Report Year 2009. Xerox paid the assessed amounts under protest and filed this suit under Chapters 112 and 171 of the Texas Tax Code to recover the disputed amounts.

Xerox sued the Comptroller and appellant/defendant Ken Paxton, Attorney General of the State of Texas (collectively, the "Comptroller Parties"). The Comptroller Parties filed a counterclaim against Xerox alleging that during the

Time Period at Issue Xerox had overstated its cost of goods sold ("COGS"). The Comptroller Parties alleged that during each report year Xerox's COGS deduction should have been much less than the amount reported by Xerox. The Comptroller Parties argued that the amount of Xerox's COGS was less than thirty percent of its total revenue for each report year.

The case proceeded to a bench trial at which three witnesses testified and documentary evidence was admitted. The trial court rendered judgment in favor of Xerox and against the Comptroller Parties. The trial court ordered the Comptroller Parties to issue one or more refund warrants to Xerox in the amount of $4,349,568, the total amount that Xerox had paid under protest for Time Period at Issue. The trial court also ordered the Comptroller Parties to pay statutory interest on that amount under Chapter 112 of the Texas Tax Code. The trial court ordered that the Comptroller Parties take nothing on their counterclaim.

The trial court issued forty-six findings of fact, including the following:

1. Xerox is primarily engaged in the retail and wholesale distribution of high-end printing and publishing systems, digital multifunctional divisions, digital copiers, laser and solid ink printers, fax machines, document management software, and supplies such as toner, paper, and ink.

2. Xerox's chief business purpose and function was to sell its various types of business equipment and supplies, which in some cases involved the use of lease contracts.

. . .

10. During the period at issue, Xerox offered a variety of distribution agreements to meet its customers' needs. Xerox's primary distribution agreements were purchase agreements, finance leases (sales-type leases), operating leases, rental agreements, and bundled arrangements.

11. All of Xerox's equipment was available for sale in the ordinary course of business for customers to acquire through a purchase agreement, sales-type lease, operating lease, rental agreement, or bundled arrangement.

12. Under purchase agreements, customers took title to the equipment, bore the risk of loss, and insured the equipment.

13. Under a sales-type lease, customers were required to make all payments under the lease (even if contract was terminated), bore the risk of loss on the equipment, and insured the equipment.

14. Xerox examined its sales-type leases with its customers to determine whether they should be treated as a sale under Financial Accounting Standard ("FAS") 13 and recorded the sales revenue at the inception of the lease.

15. Xerox's lease terms of its sales-type leases were generally for the entirety of the economic life of the equipment (five years).

16. Xerox also performed calculations at the inception of each lease to establish what residual value in the equipment will remain at the end of the lease term to ensure that 90 percent of fair value is covered during the lease term.

17. Xerox's sales-type leases satisfied subparagraphs c and/or d of Paragraph 7 of FAS 13.

18. The collectability of the minimum lease payments is reasonably predictable because Xerox ensured the lease agreements included non-cancelable provisions and cancellation penalties equaling the full value of the lease receivables.

19. Xerox's leases provided for standard warranties in accordance with the industry's common practices.

20. Under an operating lease, customers were required to make all payments (even if the contract was terminated), bore the risk of loss on the equipment, and insured the equipment. The main difference between a sales-type lease and an operating lease was that the lease term of an operating lease was less than the useful life of the equipment and the lack of reasonably assured collectability.

21. Under a rental agreement, the term was generally shorter than the usual life of the equipment. Therefore, Xerox's rental agreements were not classified as sales-type leases. . .

22. A bundled arrangement allowed customers to contract for all their print production needs (equipment, paper, toner, maintenance) in a single agreement for a negotiated monthly price. Typically, these arrangements include an incremental, variable component for page volumes in excess of

contractual page volume minimums, which are often expressed in terms of price per page.

23. Revenues under these arrangements were allocated based upon the estimated fair values of each element, considering the relative fair values of the lease, and non-lease deliverables included in the bundled arrangement. Lease deliverables included maintenance and executory costs, equipment, and financing, while non-lease deliverables generally consisted of supplies and non-maintenance services.

. . .

26. For [Report Year] 2008, Xerox had total revenues of $9,737,522,675. $3,320,550,884 was related to cash sales for equipment, supplies, and paper, $1,869,848,142 was related to sales-type leases for equipment only, $281,232,751 was related to operating leases, $2,006,360,936 was related to sales of maintenance services, $1,435,028,204 was related to sales of managed services (print production), $489,770,719 was related to financing revenue, and $334,731,039 was related to other training, licensing, and commission revenue.

27. For [Report Year] 2008, $7,605,175,730 was revenue from wholesale trade activities. The $7,605,175,730 is comprised of $3,320,550,884 [which] was related to cash sales for equipment, supplies, and paper, $1,869,848,142 [which] was related to sales-type leases for equipment only, $489,770,719 [which] was related to financing revenue, and $2,006,360,936 [which] was related to sales of maintenance services. This revenue was properly classified in Division F of the Standard Industrial Classification ("SIC") Manual.

28. For [Report Year] 2008, 78.10% ($7,605,175,730/$9,737,522,675) of Xerox's total revenue was from wholesale distribution activities.

. . .

31. For [Report Year] 2009, Xerox had total revenues of $10,510,116,487. $3,824,324,449 was related to cash sales for equipment, supplies, and paper, $2,135,586,310 was related to sales-type leases for equipment only, $336,781,105 was related to operating leases, $2,021,146,603 was related to sales of maintenance services, $1,368,826,388 was related to sales of managed services (print production), $446,790,465 was related to financing revenue, and $376,643,167 was related to other training, licensing, and commission revenue.

32. For [Report Year] 2009, $8,354,317,373 was revenue from wholesale trade activities. The $8,354,317,373 is comprised of $3,824,324,449 [which] was related to cash sales for equipment, supplies, and paper, $2,135,586,310 [which] was related to sales-type leases for equipment only, $446,790,465 [which] was related to financing revenue, and $2,021,146,603 [which] was related to sales of maintenance services. This revenue was properly classified in Division F of the SIC Manual.

33. For [Report Year] 2009, 79.49% ($8,354,317,373/$10,510,116,487) of Xerox's total revenue was from wholesale trade activities.

. . .

37. For [Report Year] 2008, Xerox originally reported a [t]otal COGS subtraction of $4,910,835,415.

38. Costs of print production, services, and rentals were not included in Xerox's Texas COGS on its [Report Year] 2008 franchise tax return.

39. As requested by [the Comptroller Parties], Xerox reviewed and updated its COGS subtraction calculation. Upon review, Xerox determined that its [t]otal COGS subtraction for [Report Year] 2008 should have been $5,994,240,999.

40. For [Report Year] 2009, Xerox originally reported a [t]otal COGS subtraction of $4,995,383,684.

41. Costs of print production, services, and rentals were not included in Xerox's Texas COGS on its [Report Year] 2009 franchise tax return.

42. As requested by [the Comptroller Parties], Xerox reviewed and updated its COGS subtraction calculation. Upon review, Xerox determined that its [t]otal COGS subtraction for [Report Year] 2009 should have been $6,647,888,992.

43. Testimony at trial established that [research and development] and Sustained Engineering ("SE") costs are not bifurcated by the type of distribution agreement that is used by the customer to acquire equipment. All [research and development] and SE costs related to a piece of equipment which were [sic] required to create that equipment.

44. Costs related to equipment sold through a sales-type lease were not included in Xerox's COGS calculations for [Report Years] 2008 and 2009.

45. [The Comptroller Parties] failed to prove that 30% of Xerox's total revenue is greater than Xerox's COGS for [Report Year] 2009.

6

The trial court issued the following conclusions of law:

47. Based on the analysis in FAS 13 and *Rent-A-Center* [*v. Hegar*], 468 S.W.3d 220 (Tex. App.—Austin 2015, no pet.), the revenue from Xerox's sales-type leases is properly classified as sales revenue (wholesale trade revenue) because the sales-type leases are more like sales than leases.

48. For [Report Year] 2008, $7,605,175,730 was revenue from wholesale trade activities. The $7,605,175,730 is comprised of $3,320,550,884 [which] was related to cash sales for equipment, supplies, and paper, $1,869,848,142 [which] was related to sales-type leases for equipment only, $489,770,719 [which] was related to financing revenue, and $2,006,360,936 [which] was related to sales of maintenance services. This revenue was properly classified in Division F of the Standard Industrial Classification ("SIC") Manual, satisfying Tex. Tax Code §171.0001(18).

49. For [Report Year] 2009, $8,354,317,373 was revenue from wholesale trade activities. The $8,354,317,373 is comprised of $3,824,324,449 [which] was related to cash sales for equipment, supplies, and paper, $2,135,586,310 [which] was related to sales-type leases for equipment only, $446,790,465 [which] was related to financing revenue, and $2,021,146,603 [which] was related to sales of maintenance services. This revenue was properly classified in Division F of the SIC Manual, satisfying Tex. Tax Code §71.0001(18).

50. For [Report Years] 2008 and 2009, Xerox's maintenance revenue is properly classified in Division F of the SIC Manual because, as outlined in Division I, it is a specialized service closely allied to activities covered in other divisions (Division F) and therefore, classified in such division.

51. For [Report Year] 2008, 78.10% ($7,605,175,730/$9,737,522,675) of Xerox's total revenue was from wholesale distribution activities, thereby satisfying Tex. Tax Code § 171.002(c)(1).

52. Of the $7,605,175,730 in revenue from wholesale trade activities, $1,381,255,637, or 18.16%, was wholesale trade revenue from products produced by Xerox or a Xerox affiliate, thereby satisfying Tex. Tax Code §171.002(c)(2).

53. For [Report Year] 2009, 79.49% ($8,354,317,373/$10,510,116,487) of Xerox's total revenue was from wholesale distribution activities, thereby satisfying Tex. Tax Code § 171.002(c)(2).

7

54. Of the $8,354,317,373 in revenue from wholesale trade activities, $1,236,709,444, or 14.80%, was wholesale trade revenue from products produced by Xerox or a Xerox affiliate, thereby satisfying Tex. Tax Code §171.002(c)(2).

55. Xerox did not provide retail or wholesale utilities, including telecommunications services, electricity, or gas, thereby satisfying Tex. Tax Code § 171.002(c)(3).

56. By satisfying the requirements outlined in Tex. Tax Code § 171.002(c), Xerox properly used the 0.5% franchise tax rate for [Report Years] 2008 and 2009.

. . .

57. Xerox properly calculated and subtracted costs related to the outlined items in Tex. Tax Code § 171.1012(c).

58. Xerox properly calculated and subtracted costs related to the outlined items in Tex. Tax Code § 171.1012(f) and Comptroller Rule 3.588(f).

59. Xerox properly calculated and subtracted costs related to the outlined items in Tex. Tax Code § 171.1012(d).

60. Xerox's mixed transaction costs qualify for COGS under Comptroller Rule 3.588(c)(7).

61. Tax Code § 171.1012(k-1) is inapplicable to Xerox.

62. For [Report Year] 2008, under Tex. Tax Code §§ 171.101(a) and 171.1012, [the Comptroller Parties] have failed to meet [their] burden of proof as a matter of law that Xerox's COGS were less than 30% of Xerox's total revenue.

63. [For Report Year 2009] Xerox's total revenue multiplied by 30% was $3,201,418,233. As a matter of law, [the Comptroller Parties] have failed to meet [their] burden of proof that 30% of Xerox's total revenue is greater than Xerox's COGS.

## II. ISSUES AND ANALYSIS

The Comptroller Parties timely appealed the trial court's judgment. The Supreme Court of Texas ordered this case transferred to the Fourteenth Court of

Appeals from the Third Court of Appeals.[1] The Comptroller Parties present two issues on appeal. In their first issue, they challenge the trial court's take-nothing judgment on their counterclaim. In their second issue, they challenge the trial court's rendition of judgment in favor of Xerox on its claims against the Comptroller Parties.

**A.    Have the Comptroller Parties shown that the trial court erred in concluding that the 0.5% franchise-tax rate applied to Xerox during the Time Period at Issue?**

In their second issue, the Comptroller Parties assert that Xerox is not entitled to the reduced franchise tax rate allowed for taxpayers "primarily engaged in retail or wholesale trade" because a majority of its revenue is from leasing equipment and providing services, not from the "sale" of goods. During the Time Period at Issue, there were two franchise tax rates: 1% and 0.5%. *See* Act of May 2, 2006, ch. 1, § 2, 2006 Tex. Gen. Laws 1, 6–7 (codified at Tex. Tax Code § 171.002). To qualify for the lower 0.5% rate, Xerox must have been "primarily engaged in retail or wholesale trade" during the Time Period at Issue. *See id.* Xerox does not contend that it was primarily engaged in retail trade during the Time Period at Issue. Instead, Xerox contends, and the trial court found, that during the Time Period at issue, Xerox was primarily engaged in wholesale trade.

For Xerox to have been primarily engaged in wholesale trade, among other things, the total revenue from its activities in wholesale trade must have been greater than the total revenue from its activities in trades other than the wholesale trade. *Id.* The trial court found that in Report Year 2008 and in Report Year 2009,

---

[1] In transfer cases, the transferee court must decide the appeal in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court. *See* Tex. R. App. P. 41.3.

the total revenue from Xerox's activities in wholesale trade was greater than the total revenue from Xerox's activities in trades other than the wholesale trade. During the Time Period at Issue, "wholesale trade" for franchise-tax purposes meant "the activities described in Division F of the 1987 Standard Industrial Classification Manual published by the federal Office of Management and Budget" (hereinafter, "Division F"). Tex. Tax Code Ann. § 171.0001(18) (West, Westlaw through 2021 R.S.). Division F "includes establishments or places of business primarily engaged in selling merchandise to retailers; to industrial, commercial, institutional, farm, construction contractors, or professional business users; or to other wholesalers. . . ." Division F does not contain a definition of "selling." According to Xerox, establishments selling merchandise to essentially anyone other than personal consumers are engaged in wholesale trade under Division F. In Conclusion of Law 47, the trial court determined that the revenue from Xerox's sales-type leases under FAS 13 is properly classified as revenue from sales falling within the scope of wholesale trade under Division F. The Comptroller Parties assert that the trial court erred in concluding that the sales-type leases should be treated as sales. The Comptroller Parties focus on the common meaning of "selling" under Division F.

### 1. Standard of Review

We review the trial court's conclusions of law de novo, and its findings of fact for sufficiency of the evidence. *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable

10

factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

## 2. *The Ordinary Meaning of "selling" as used in Division F*

The Legislature incorporated Division F into the Texas Tax Code as the definition of "wholesale trade." *See* Tex. Tax Code Ann. § 171.0001(18). The Legislature has not provided a statutory definition of "selling." The parties do not assert that "selling" has a technical or particular meaning, and research has not revealed any Texas cases showing that this term has any such technical or particular meaning. In addition, no different, more limited, or precise definition of selling is apparent from the term's use in this statutory context. *See State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013) (per curiam). Therefore, we construe the term "selling" based on its ordinary meaning. *See American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42; *City of San Antonio v. Hartman,* 201 S.W.3d 667, 672, n. 19 (Tex. 2006).

The Comptroller Parties argue that the under the ordinary meaning of "selling," selling takes place only when there is a transfer of title to property for a price.[2] The Comptroller Parties cite the Legislature's definition of "sale" in article 2 of the Uniform Commercial Code. *See* Tex. Bus. & Comm. Code Ann. § 2.106(a) (West, Westlaw through 2021 R.S.). Under this definition, a "sale" consists in the passing of title from the seller to the buyer for a price. *See id.* Xerox asserts that transfer or passing of title is not necessary, and that this court should be

---

[2] The Comptroller Parties incorporate their arguments under the first issue as to the ordinary meaning of "sold" in Tax section 171.1012(a) into their arguments under the second issue as to the ordinary meaning of "selling" in Division F.

guided by the statutory definition of "sale" in the Limited Sales, Excise, and Use Tax Act, in which "sale" is broadly defined to include the exchange, lease, or rental of tangible personal property. *See* Tex. Tax Code Ann. § 151.005(2) (West, Westlaw through 2021 R.S.).

The parties have not cited and research has not revealed a case in which the court determines the meaning of "selling," as used in Division F. The parties have not cited and research has not revealed a Texas case in which the court determines the ordinary meaning of "selling," "sold," or "sale." In *American Multi-Cinema, Inc.*, the Supreme Court of Texas held that the ordinary meaning of "sold" as used in Tax section 171.1012(a) requires a transfer, but the court did not specifically determine what the ordinary meaning of "sold" was in the context of that case. *See American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42. Thus, the issue of whether the ordinary meaning of "selling," "sold," or "sale" requires the transfer or passage of title appears to be an issue of first impression in Texas. The Legislature could have defined "selling" in this context as requiring the passage of title, as the Legislature did in section 2.106(a) of the Business and Commerce Code, or the Legislature could have defined "selling" in this context as not requiring the passage of title, as the Legislature did in the Limited Sales, Excise, and Use Tax Act. *See* Tex. Tax Code Ann. § 151.005(2); Tex. Tax Code Ann. § 151.005(2). However, the Legislature chose not to provide an express definition of "selling," and the definitions from other statutes cited by the parties do not purport to state the ordinary meaning of "selling" or "sale." In the context of this case, the Legislature's failure to provide a statutory definition of "selling" requires us to determine whether the ordinary meaning of the term "selling" requires the transfer or passage of title for "selling" to occur. *See American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42; *Hartman,* 201 S.W.3d at 672, n.19. After careful consideration,

12

we conclude that ordinary meaning of "selling," "sold," or "sale" does not require the transfer or passage of title, though it does require the transfer of the item being sold. *See American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42 (holding that ordinary meaning of "sold" requires a transfer and citing favorably definitions of "sold" that do not require a transfer of title); *Sale*, The American Heritage Dictionary of the English Language (5th ed.) (defining "sale" as "an exchange of goods or services for an amount of money or its equivalent"); *Sale*, Black's Law Dictionary (11th ed. 2019) (defining "sale" as "[t]he transfer of property *or* title for a price") (emphasis added); *Transfer*, Black's Law Dictionary (11th ed. 2019) (defining "transfer" as "[a]ny mode of disposing of or parting with an asset or an interest in an asset"); *see also State v. Medina*, 536 S.W.3d 528, 533 (Tex. App.—San Antonio 2017, pet. ref'd) (holding, in a criminal appeal, that the ordinary meaning of "sale" is "to give or agree to give something to someone in exchange for money, i.e., transferring property from one person to another for a price").[3] Therefore, we reject the Comptroller Parties' argument that Xerox's sales-type leases cannot fall within the scope of Division F because these leases do not involve any transfer of title.

### 3. The trial court's determination that revenue from Xerox's sales-type leases constitutes wholesale trade revenue.

In Conclusion of Law 47, the trial court determined that the revenue from Xerox's sales-type leases under FAS 13 is properly classified as revenue from sales falling within the scope of wholesale trade under Division F. The Comptroller Parties contend that the trial court erred in making this conclusion of law.

---

[3] The Comptroller Parties cite the Third Court of Appeals's opinion in *Hegar v. Sunstate Equip. Co., LLC*. *See* 578 S.W.3d 533, 542–43 (Tex. App.—Austin 2017), *aff'd*, 601 S.W.3d 685 (Tex. 2020). The court in that case did not address the meaning of "selling," "sold," or "sale." *See id.*

Under Financial Accounting Standard 13, a sales-type lease must satisfy one of the four criteria in Paragraph 7 and both of the criteria in Paragraph 8. The criteria in Paragraph 7 are:

a. The lease transfers ownership of the property to the lessee by the end of the lease term (as defined in paragraph 5(f)).

b. The lease contains a bargain purchase option (as defined in paragraph 5(d)).

c. The lease term (as defined in paragraph 5(f)) is equal to 75 percent or more of the estimated economic life of the leased property (as defined in paragraph 5(g)). However, if the beginning of the lease term falls within the last 25 percent of the total estimated economic life of the leased property, including earlier years of use, this criterion shall not be used for purposes of classifying the lease.

d. The present value at the beginning of the lease term of the minimum lease payments (as defined in paragraph 5(j))), excluding that portion of the payments representing executory costs such as insurance, maintenance, and taxes to be paid by the lessor, including any profit thereon, equals or exceeds 90 percent of the excess of the fair value of the leased property (as defined in paragraph 5(c)) to the lessor at the inception of the lease over any related investment tax credit retained by the lessor and expected to be realized by him. However, if the beginning of the lease term falls within the last 25 percent of the total estimated economic life of the leased property, including earlier years of use, this criterion shall not be used for purposes of classifying the lease. A lessor shall compute the present value of the minimum lease payments using the interest rate implicit in the lease (as defined in paragraph 5(k)). A lessee shall compute the present value of the minimum lease payments using his incremental borrowing rate (as defined in paragraph 5(1)), unless (i) it is practicable for him to learn the implicit rate computed by the lessor and (ii) the implicit rate computed by the lessor is less than the lessee's incremental borrowing rate. If both of those conditions are met, the lessee shall use the implicit rate.

The trial court found that Xerox's sales-type leases satisfied either Paragraph 7(c) or 7(d) above, and no party has challenged this finding on appeal. To constitute a

14

sales-type lease under FAS 13, a lease must also satisfy both of the following criteria:

> a. Collectibility of the minimum lease payments is reasonably predictable. A lessor shall not be precluded from classifying a lease as a sales-type lease or as a direct financing lease simply because the receivable is subject to an estimate of uncollectibility based on experience with groups of similar receivables.

> b. No important uncertainties surround the amount of unreimbursable costs yet to be incurred by the lessor under the lease. Important uncertainties might include commitments by the lessor to guarantee performance of the leased property in a manner more extensive than the typical product warranty or to effectively protect the lessee from obsolescence of the leased property. However, the necessity of estimating executory costs such as insurance, maintenance, and taxes to be paid by the lessor (see paragraphs 17(a) and 18(a)) shall not by itself constitute an important uncertainty as referred to herein.

The trial court found that Xerox's sales-type leases satisfied the first criterion, and Xerox contends that the trial court's Finding of Fact 19 shows that its sales-type leases satisfied the second criterion. The Comptroller Parties do not contend that the sales-type leases did not satisfy the above two criteria.

Under the terms of the sales-type leases, unless the lessee exercises its option to "purchase" the leased equipment, title to the leased equipment remains with Xerox, and the lessee must return the equipment to Xerox at the end of the term. The lessee may not cancel or terminate the lease and is responsible to pay all payments under the lease for the full term of the lease, which trial evidence showed was for the useful life of the equipment. Though the lessees have the option to "purchase" the equipment at the end of the lease term, trial evidence showed that "[m]ost equipment is returned by lessees at or near the end of the contracted term" and "[t]he equipment is typically scrapped. I mean, it has no value the way it is."

15

Xerox relies upon the Third Court of Appeals's opinion in *Rent-A-Center, Inc. v. Hegar*, and the Comptroller Parties argue that this case is not on point. *See* 468 S.W.3d 220, 222–25 (Tex. App.—Austin 2015, no pet.). The *Rent-A-Center* court indicated that franchise-tax consequences are based on the transaction's substance rather than its form and that the substance of various rent-to-own contracts were sales within the meaning of Division G of the 1987 Standard Industrial Classification Manual incorporated into Tax Code section 171.0001(12) for use in determining whether the taxable entity was primarily engaged in retail trade under Texas Tax Code section 171.002(c). *See id.* Nonetheless, the facts in *Rent-A-Center* were significantly different from the facts in today's case, and we presume that the *Rent-A-Center* case is not on point.

Courts must base their analysis on the substance, not the form of the transaction. *See Gulf Chemical & Metallurgical Corp. v. Hegar*, 460 S.W.3d 743, 749–50 & n.10 (Tex. App.—Austin 2015, no pet.). The Supreme Court of Texas has instructed that in the area of tax law, courts should consider the essence of the transaction, and courts should not disregard the economic realities underlying the transactions in issue. *See Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 & n.14 (Tex. 2013); *H.B. Aviation, LLC v. Hegar*, No. 03-19-00414-CV, 2020 WL 6811993, at *7 (Tex. App.—Austin Nov. 20, 2020, pet. filed) (considering the economic realities of the transaction in determining whether a sale occurred under the use-tax statute) (mem. op.). Though the sales-type leases stated that they were leases and did not state that they were sales, courts give effect to the substance of the transactions not the form. *See Gulf Chemical & Metallurgical Corp.*, 460 S.W.3d at 749–50 & n.10.

The trial court did not err in effectively concluding that the substance of Xerox's sales-type leases falls within the scope of Division F and thus constitutes

wholesale trade under Tax Code section 171.0001(18). *See* Tex. Tax Code Ann. § 171.0001(18); *Roark Amusement & Vending, L.P.*, 422 S.W.3d at 637 & n.14; *Gulf Chemical & Metallurgical Corp.*, 460 S.W.3d at 749–50 & n.10. The trial court did not err in concluding that it was proper to classify the revenue from Xerox's sales-type leases under FAS 13 as revenue from sales falling within the scope of wholesale trade under Division F.[4] *See* Tex. Tax Code Ann. § 171.0001(18); *Roark Amusement & Vending, L.P.*, 422 S.W.3d at 637 & n.14; *Gulf Chemical & Metallurgical Corp.*, 460 S.W.3d at 749–50 & n.10.

### 4. The Comptroller Parties' argument that Tax Code section 171.002(c)(1) is an exemption.

The Comptroller Parties assert that we should strictly construe Tax Code section 171.002(c)(1) against Xerox because this statute is tantamount to an exemption. The Supreme Court of Texas has previously held that tax exemptions must be construed strictly because "they are the antithesis of equality and uniformity and because they place a greater burden on other taxpaying businesses and individuals." *Bullock v. Nat'l Bancshares Corp.*, 584 S.W.2d 268, 272 (Tex. 1979) (citation omitted). But Chapter 171 makes clear that Tax Code section 171.002(c)(1) is not an exemption. The franchise tax is levied on a taxable entity's "taxable margin." Tex. Tax Code Ann. § 171.002. It is not a tax on revenue. *Sunstate Equip. Co., LLC. v. Hegar*, 601 S.W.3d 685, 690 (Tex. 2020). Tax Code section 171.002(c)(1) is part of the determination of the applicable franchise-tax rate. *See* Tex. Tax Code Ann. § 171.002. Determining that a lower franchise-tax rate applies does not "exempt" or "deduct" otherwise taxable

---

[4] The Comptroller Parties cite the Third Court of Appeals's opinion in *Hegar v. Sunstate Equip. Co., LLC*. *See* 578 S.W.3d 533, 542–43 (Tex. App.—Austin 2017), *aff'd*, 601 S.W.3d 685 (Tex. 2020). The court in that case did not address any issue regarding sales-type leases under FAS 13 or the scope of the definition of wholesale trade. *See id.*

amounts from taxation. *See Sunstate Equip. Co., LLC*., 601 S.W.3d at 690. Instead, the determination of the applicable franchise-tax rate is how the amount subject to tax is ascertained in the first place. *See* Tex. Tax Code Ann. § 171.002; *Sunstate Equip. Co., LLC*., 601 S.W.3d at 690. We conclude that Tax Code section 171.002(c)(1) is not tantamount to an exemption, and we do not strictly construe the statute against Xerox. *See Sunstate Equip. Co., LLC*., 601 S.W.3d at 690.

> **5.** ***The trial court's determination that the total revenue from Xerox's activities in wholesale trade was greater than the total revenue from Xerox's activities in trades other than the wholesale trades.***

The Comptroller Parties assert that because no revenue from Xerox's sales-type leases could properly be considered revenue from activities in Division F, the trial court erred by (1) including the $1,869,848,142 and the $489,770,719 mentioned in conclusions of law 48 as revenue from Xerox's activities in wholesale trade for Report Year 2008, and (2) including the $2,135,586,310 and the $446,790,465 mentioned in conclusion of law 49 as revenue from Xerox's activities in wholesale trade for Report Year 2009. As discussed above, we conclude that the trial court did not err in considering revenue from Xerox's sales-type leases as revenue from activities in Division F. Therefore, the trial court did not err in including these amounts as revenues from Xerox's activities in wholesale trade.

The Comptroller Parties also assert that the trial court erred in including revenue related to maintenance services as revenues from Xerox's activities in wholesale trade. We presume, without deciding that the trial court so erred for each of the report years. Even under this presumption, the Comptroller Parties have not shown that the trial court erred in concluding for each report year that the total revenue from Xerox's activities in wholesale trade was greater than the total

revenue from Xerox's activities in trades other than the wholesale trades. Therefore, we overrule the Comptroller Parties' second issue.

**B.    Have the Comptroller Parties shown that the trial evidence conclusively proved their entitlement to judgment on their counterclaim?**

In their first issue the Comptroller Parties assert that the cost-of-goods-sold deduction in Tax Code section 171.1012 does not allow Xerox to deduct costs of leasing and renting office equipment to its customers—transactions that do not involve the sale of goods. The Comptroller Parties contend that the trial court erred in failing to reduce Xerox's COGS deduction. *See* Tex. Tax Code Ann. § 171.1012 (West, Westlaw through 2021 R.S.).

### 1.  *Standard of Review*

We review the trial court's conclusions of law de novo, and its findings of fact for sufficiency of the evidence. *American Multi-Cinema, Inc.*, 605 S.W.3d at 40. The Comptroller Parties' first issue deals with their counterclaim, as to which they had the burden of proof. *See Queen v. RBG USA, Inc.*, 495 S.W.3d 316, 322 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The trial court found against the Comptroller Parties on their counterclaim, and the Comptroller Parties have not argued that the trial evidence is factually insufficient to support any of the trial court's findings of fact. Therefore, on appeal the Comptroller Parties must demonstrate that the trial evidence conclusively established all facts necessary to support their recovery on the counterclaim. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable

factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

## 2. *Franchise-Tax Liability*

We begin by outlining some general concepts about franchise-tax liability. Since 1893, Texas has imposed a franchise tax on most domestic and foreign corporations operating in this State. *American Multi-Cinema, Inc.*, 605 S.W.3d at 38. These taxes "tax . . . the value of th[e] privilege" to transact business in Texas, which "confers economic benefits, including the opportunity to realize gross income and the right to invoke the protection of local law." *Id.* (quoting *In re Nestle USA, Inc.*, 387 S.W.3d 610, 612 (Tex. 2012)).

Determining a taxable entity's franchise tax liability begins with the entity's "'total revenue,' a figure derived by adding together select amounts reportable as gross income on a federal tax return, subtracting bad debts and other items included on the federal return, and excluding receipts associated with various transactions." *American Multi-Cinema, Inc.*, 605 S.W.3d at 38 (quoting *Graphic Packaging Corp. v. Hegar*, 538 S.W.3d 89, 93 (Tex. 2017)). In Report Years 2008 and 2009, a taxable entity could subtract from total revenue the greatest of: (1) cost of goods sold; (2) compensation and benefits paid to officers, directors, owners, partners, and employees, subject to a cap; or (3) thirty percent of total revenue. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 4, sec. 171.101, 2006 Tex. Gen. Laws 1, 8 (codified at Tax Code § 171.101(a)). In practice, the costs a taxable entity chooses to subtract from total revenue depend on its business: sellers of goods typically subtract COGS, while service providers generally elect to subtract either thirty percent of revenues or compensation paid. *See* Tex. Tax Code Ann. §

171.1012; *American Multi-Cinema, Inc.*, 605 S.W.3d at 38. In their counterclaim the Comptroller Parties alleged that during the Time Period at Issue Xerox overstated its COGS. The Comptroller Parties alleged that during each report year Xerox's COGS deduction should have been much less than the amount reported by Xerox. The Comptroller Parties argued that for each report year the amount of Xerox's COGS was less than thirty percent of its total revenue.[5] *See* Act of May 2, 2006, 2006 Tex. Gen. Laws at 8.

The provision governing the COGS deduction defines "goods" as "real or tangible personal property sold in the ordinary course of business of a taxable entity," and "tangible personal property" does not include services. Tex. Tax Code Ann. § 171.1012(a)(1),(3) (West, Westlaw through 2021 R.S.). Generally, the amount of the COGS deduction includes "all direct costs of acquiring or producing the goods," *id.* § 171.1012(c), plus additional specified costs such as "the costs of quality control, including replacement of defective components pursuant to standard warranty policies" *id.* § 171.1012(d)(9), and limited administrative and overhead costs, *id.* § 171.1012(f), but does not include other enumerated costs such as "distribution costs, including outbound transportation costs," *id.* § 171.1012(e); *see Hegar v. Gulf Copper & Manufacturing Corp.*, 601 S.W.3d 668, 679 (Tex. 2020). A taxable entity may include a cost in its COGS deduction only if the taxable entity owns the goods it is selling. *Id.* § 171.1012(i); *American Multi-Cinema, Inc.*, 605 S.W.3d at 41.

---

[5] Because the complaints under the first issue address only the deduction from total revenue, we need not address the other components of the formula for calculating franchise-tax liability to resolve these complaints.

### 3. The Ordinary Meaning of "sold" as used in Tax Code section 171.1012(a)(1)

For the purposes of the COGS deduction, "goods" are defined as "real or tangible personal property sold in the ordinary course of business of a taxable entity." Tex. Tax Code Ann. § 171.1012(a)(1). The Legislature has not provided a statutory definition of "sold." The parties do not assert that "sold" has a technical or particular meaning, and research has not revealed any Texas cases showing that this term has any such technical or particular meaning. In addition, no different, more limited, or precise definition of "sold" is apparent from the term's use in this statutory context. *See $1,760.00 in U.S. Currency*, 406 S.W.3d at 180. Therefore, we construe the term "sold" based on its ordinary meaning. *See American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42; *Hartman,* 201 S.W.3d at 672, n. 19.

The Comptroller Parties assert that for franchise-tax purposes, Xerox's sales-type leases may not be considered "sales" and the property subject to these leases may not be considered "sold" because there is no transfer or passing of title under these leases. The Comptroller Parties argue that under the ordinary meaning of "sale," a sale takes place only when there is a transfer of title to property for a price. The Comptroller Parties cite the Legislature's definition of "sale" in article 2 of the Uniform Commercial Code. *See* Tex. Bus. & Comm. Code Ann. § 2.106(a). Under this definition, a "sale" consists in the passing of title from the seller to the buyer for a price. *See id.* Xerox counters that transfer or passing of title is not necessary, and that this court should be guided by the statutory definition of "sale" in the Limited Sales, Excise, and Use Tax Act, in which "sale" is broadly defined to include the exchange, lease, or rental of tangible personal property. *See* Tex. Tax Code Ann. § 151.005(2).

The parties have not cited and research has not revealed a case in which the court determines the meaning of "sold," as used in Tax Code section 171.1012(a)(1). The parties have not cited and research has not revealed a Texas case in which the court determines the ordinary meaning of "selling," "sold," or "sale." In *American Multi-Cinema, Inc.*, the Supreme Court of Texas held that the ordinary meaning of "sold" as used in Tax section 171.1012(a)(1) requires a transfer, but the court did not specifically determine what the ordinary meaning of "sold" was in the context of that case. *See American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42. Thus, the issue of whether the ordinary meaning of "selling," "sold," or "sale" requires the transfer or passage of title appears to be an issue of first impression in Texas. The Legislature could have defined "sold" in this context as requiring the passage of title, as the Legislature did in section 2.106(a) of the Business and Commerce Code, or the Legislature could have defined "sold" in this context as not requiring the passage of title, as the Legislature did in the Limited Sales, Excise, and Use Tax Act. *See* Tex. Tax Code Ann. § 151.005(2); Tex. Tax Code Ann. § 151.005(2). The Legislature chose not to provide an express definition of "sold," and the definitions from other statutes cited by the parties do not purport to state the ordinary meaning of "selling," "sale," or "sold." In the context of this case, the Legislature's failure to provide a statutory definition of "sold" requires us to determine whether the ordinary meaning of the term "sold" requires the transfer or passage of title for property to have been "sold." *See American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42; *Hartman,* 201 S.W.3d at 672, n. 19. After careful consideration, we conclude that ordinary meaning of "sold" or "sale" does not require the transfer or passage of title, though it does require the transfer of the item being sold. *See American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42 (holding that ordinary meaning of "sold" requires a transfer and citing

23

favorably definitions of "sold" that do not require a transfer of title); *Sale*, The American Heritage Dictionary of the English Language (5th ed.) (defining "sale" as "an exchange of goods or services for an amount of money or its equivalent"); *Sale*, Black's Law Dictionary (11th ed. 2019) (defining "sale" as "[t]he transfer of property *or* title for a price") (emphasis added); *Transfer*, Black's Law Dictionary (11th ed. 2019) (defining "transfer" as "[a]ny mode of disposing of or parting with an asset or an interest in an asset"); *see also Medina*, 536 S.W.3d at 533 (holding, in a criminal appeal, that the ordinary meaning of "sale" is "to give or agree to give something to someone in exchange for money, i.e., transferring property from one person to another for a price").[6] Therefore, we reject the Comptroller Parties' argument that Xerox's sales-type leases may not be considered "sales" and the property subject to these leases may not be considered "sold" because there is no transfer or passing of title under these leases.

The Comptroller Parties also rely on Tax Code section 171.1012(k-1), which allows three categories of taxable entities to subtract as COGS the costs otherwise allowed by section 171.1012 "in relation to tangible personal property that the entity rents or leases in the ordinary course of business." Tex. Tax Code Ann. § 171.1012(k-1) (West, Westlaw through 2021 R.S.); *see Sunstate Equip. Co., LLC*., 601 S.W.3d at 693–94. The Comptroller Parties assert that if the ordinary meaning of "sales" or "sold" covered all leases, the Legislature would not have needed to enact subsection (k-1). Though this may be a correct statement, the failure of all leases to fall within the common meaning of "sales" or "sold" does not preclude sale-type leases from falling within this common meaning or prevent a court from

---

[6] The Comptroller Parties cite the Third Court of Appeals's opinion in *Hegar v. Sunstate Equip. Co., LLC*. *See* 578 S.W.3d 533, 542–43 (Tex. App.—Austin 2017), *aff'd*, 601 S.W.3d 685 (Tex. 2020). The court in that case did not address the meaning of "selling," "sold," or "sale." *See id.*

considering property leased under a sales-type lease to be "sold" under the ordinary meaning of sold as used in Tax Code section 171.1012(a)(1). The Legislature did not state that an entity other than one of the three entities listed in subsection (k-1) may not make a COGS deduction based on costs relating to property leased under sales-type leases that fall within the common meaning of "sold." *See* Tex. Tax Code Ann. § 171.1012(k-1). The Legislature did not provide that the taxable entities mentioned in subsection (k-1) are the only entities that may subtract as COGS the costs allowed by section 171.1012 in relation to tangible personal property that the entity rents or leases. *See id.*

### 4. The treatment of sales-type leases as sales.

Under the terms of the sales-type leases, unless the lessee exercises its option to "purchase" the leased equipment, title to the leased equipment always remains with Xerox, and the lessee must return the equipment to Xerox at the end of the term. The lessee may not cancel or terminate the lease and is responsible to pay all payments under the lease for the full term of the lease, which trial evidence showed was for the useful life of the equipment. Though the lessees have the option to "purchase" the equipment at the end of the lease term, trial evidence showed that "[m]ost equipment is returned by lessees at or near the end of the contracted term" and "[t]he equipment is typically scrapped. I mean, it has no value the way it is."

Courts must base their analysis on the substance, not the form of the transaction. *See Gulf Chemical & Metallurgical Corp.*, 460 S.W.3d at 749–50 & n.10. The Supreme Court of Texas has instructed that in the area of tax law, courts should consider the essence of the transaction, and courts should not disregard the economic realities underlying the transactions in issue. *See Roark Amusement & Vending, L.P.*, 422 S.W.3d at 637 & n.14; *H.B. Aviation, LLC*, 2020 WL 6811993,

at *7 (considering the economic realities of the transaction in determining whether a sale occurred under the use-tax statute). Though the sales-type leases stated that they were leases and did not state that they were sales, courts give effect to the substance of the transactions not the form. *See Gulf Chemical & Metallurgical Corp.*, 460 S.W.3d at 749–50 & n.10. We conclude that property leased under a sales-type lease may be considered to be "sold" under the ordinary meaning of sold as used in Tax Code section 171.1012(a)(1).[7] *See* Tex. Tax Code Ann. § 171.1012(a)(1); *American Multi-Cinema, Inc.*, 605 S.W.3d at 41–42 (holding that ordinary meaning of "sold" requires a transfer and citing favorably definitions of "sold" that do not require a transfer of title); *Roark Amusement & Vending, L.P.*, 422 S.W.3d at 637 & n.14; *Gulf Chemical & Metallurgical Corp.*, 460 S.W.3d at 749–50 & n.10.; *Sale*, The American Heritage Dictionary of the English Language (5th ed.) (defining "sale" as "an exchange of goods or services for an amount of money or its equivalent"); *Sale*, Black's Law Dictionary (11th ed. 2019) (defining "sale" as "[t]he transfer of property *or* title for a price") (emphasis added). Therefore, the trial court did not err to the extent it ruled that Xerox properly could include costs related to sales-type leases in its COGS deduction during the Time Period at Issue.

---

[7] Xerox relies upon the Third Court of Appeals's opinion in *Rent-A-Center, Inc. v. Hegar*, and the Comptroller Parties argue that this case is not on point. *See* 468 S.W.3d at 222–25. The facts in *Rent-A-Center* were significantly different from the facts in today's case, and the *Rent-A-Center* case did not involve any issue regarding the COGS deduction. *See id.* We presume that the *Rent-A-Center* case is not on point. The Comptroller Parties also cite the Third Court of Appeals's opinion in *Hegar v. Sunstate Equip. Co., LLC*. *See* 578 S.W.3d 533, 542–43 (Tex. App.—Austin 2017), *aff'd*, 601 S.W.3d 685 (Tex. 2020). The court in that case did not address any issue regarding sales-type leases under FAS 13 or the scope of the definition of "sold" or "sale." *See id.*

### 5. The Comptroller Parties' argument that Tax Code section 171.1012 is an exemption.

The Comptroller Parties assert that we should strictly construe Tax Code section 171.1012 against Xerox because this statute is tantamount to an exemption. After the Comptroller Parties filed their brief, the Supreme Court of Texas held that Tax Code section 171.1012 is not an exemption and should not be strictly construed against the taxpayer, and we must follow this precedent. *See Sunstate Equip. Co., LLC*., 601 S.W.3d at 690. In another part of their brief, the Comptroller Parties indicate that the COGS deduction is an exemption and that therefore Xerox had the burden of clearly showing the portion of the costs related to the direct costs of acquiring or producing goods that Xerox sells. The cases that the Comptroller Parties cite in support of this proposition are not on point. Tax Code section 171.1012 is not an exemption, and Xerox did not have the burden of proof as to the Comptroller Parties' counterclaim. *See Sunstate Equip. Co., LLC*., 601 S.W.3d at 690; *Queen*, 495 S.W.3d at 322.

### 6. The Comptroller Parties' challenges to costs that Xerox included in its COGS deduction

Under their first issue, the Comptroller Parties make numerous specific challenges to costs that they claim Xerox improperly included in its COGS deduction for the two report years. The Comptroller Parties assert challenges on the grounds that (1) some costs are based on leased or rented equipment; (2) some costs are related to services; (3) some costs are delivery and outbound transportation costs; and (4) Xerox's costs related to research and development, experimental engineering, and design activities did not distinguish between leased equipment and sold equipment.

### *Challenges based on leased equipment as to Report Year 2008*

The Comptroller Parties challenge $5,032,896 in "service parts costs related to the technical service of equipment that is in rental status" on Line 114 of Defendant's Exhibit 19.[8] Robert Hoyt, one of Xerox's tax consultants, testified that these costs "related to equipment that was provided under sales-type leases." The Comptroller Parties allege that Xerox improperly included these costs in its COGS deduction for Report Year 2008 because the costs related to rented equipment. Based on our conclusions in section II. B. 4. above, it would have been proper for Xerox to have included costs related to sales-type leases. After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved the amount, if any, of these costs that related to equipment that was provided under leases that were not sales-type leases. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel v. Butler Drilling Co.*, 635 S.W.2d 834, 844 (Tex. App.— Houston [14th Dist.] 1982, writ ref'd n.r.e.). The Comptroller Parties have not shown that it would have been improper for Xerox to include these costs in its COGS deduction for Report Year 2008.

The Comptroller Parties also challenge $4,619,370 in "[s]ervice parts cost for equipment leased" on Line 119 of Defendant's Exhibit 19. We presume, without deciding, that the Comptroller Parties have shown that they conclusively proved that these costs were based on equipment provided under leases that were not sales-type leases and that it would have been improper for Xerox to have included these costs in its COGS deduction for Report Year 2008.

---

[8] Defendant's Exhibit 19 contains a list of items that Xerox included in the calculation of the costs that should have been included in its COGS deduction for Report Year 2008.

The Comptroller Parties also challenge the costs listed on the following lines of Defendant's Exhibit 19: Line 14, Line 26, Line 37, Line 56, Line 109, Lines 138–41, Lines 169–72, and Lines 194–96. The Comptroller Parties assert that Xerox improperly included these costs in its COGS deduction for Report Year 2008 because these costs relate to leased equipment. Based on our conclusions in section II. B. 4. above, it would have been proper for Xerox to have included costs related to sales-type leases. We presume that some of the costs on each of these lines related to equipment that was provided under leases that were not sales-type leases. After examining the trial evidence under the applicable standard of review as to each of these complaints, we conclude that the Comptroller Parties have not shown that they conclusively proved the amount of these costs that related to equipment that was provided under leases that were not sales-type leases. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844.

### Challenges based on leased equipment as to Report Year 2009

The Comptroller Parties challenge $2,889,737 in costs for "Service parts costs related to the technical service of equipment that is in rental status" on Line 132 of Defendant's Exhibit 20.[9] The Comptroller Parties allege that Xerox improperly included these costs in its COGS deduction for Report Year 2009 because Robert Hoyt, one of Xerox's tax consultants, agreed that these costs are costs of providing services to equipment that is rented, and therefore that these costs are not includable. The Comptroller Parties assert that Hoyt voiced this agreement when he answered the following question at trial:

---

[9] Defendant's Exhibit 20 contains a list of items that Xerox included in the calculation of the costs that should have been included in its COGS deduction for Report Year 2009.

[Comptroller Parties' Counsel]: And [Line] 132 is similar to the one we talked about last year, but it's only related to stuff that's rented. Do you agree with me today that that should not have been included in the direct line?

[Hoyt]: Yes. I think that's probably right.

Xerox did not stipulate or judicially admit that Xerox improperly included these costs in its COGS deduction for Report Year 2009. In testifying about the similar cost item on Line 114 of Defendant's Exhibit 19, Hoyt testified that these costs "related to equipment that was provided under sales-type leases." Based on our conclusions in section II. B. 4. above, it would have been proper for Xerox to have included costs related to sales-type leases. After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved that it would have been improper for Xerox to have included the costs on Line 132 of Defendant's Exhibit 20 in its COGS deduction for Report Year 2009. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322.

The Comptroller Parties also challenge $9,520,568 in "[s]ervice parts cost for equipment leased" on Line 137 of Defendant's Exhibit 20. We presume, without deciding, that the Comptroller Parties have shown that they conclusively proved that these costs were based on equipment provided under leases that were not sales-type leases and that it would have been improper for Xerox to have included these costs in its COGS deduction for Report Year 2009.

The Comptroller Parties also challenge the costs listed on Lines 23, 55, 79, 127, 131, 153–56, 177, 183–87, 215–18, 224, 227, 230, 236, 252, 255–56, 258, 274, and 285 of Defendant's Exhibit 20. The Comptroller Parties allege that Xerox improperly included these costs in its COGS deduction for Report Year 2008 because these costs relate to leased equipment. Based on our conclusions in section

30

II. B. 4. above, it would have been proper for Xerox to have included costs related to sales-type leases. We presume that some of the costs on each of these lines related to equipment that was provided under leases that were not sales-type leases. After examining the trial evidence under the applicable standard of review as to each of these complaints, we conclude that the Comptroller Parties have not shown that they conclusively proved the amount of these costs that related to equipment that was provided under leases that were not sales-type leases. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844.

### *Challenges based on costs related to services*

The provision governing the COGS deduction defines "goods" as "real or tangible personal property sold in the ordinary course of business of a taxable entity." Tex. Tax Code Ann. § 171.1012(a)(1). The definition of "tangible personal property" specifically excludes "services" from the scope of the definition. Tex. Tax Code Ann. § 171.1012(a)(3). Generally, the amount of the COGS deduction includes "all direct costs of acquiring or producing the goods," plus additional specified costs such as "the costs of quality control, including replacement of defective components pursuant to standard warranty policies, inspection directly allocable to the production of goods, and repairs and maintenance of goods." Tex. Tax Code Ann. § 171.1012(c), § 171.1012(d)(9). A taxable entity may include a cost in its COGS deduction only if the taxable entity owns the goods it is selling. Tex. Tax Code Ann. § 171.1012(i). Under Comptroller Rule 3.588, if a transaction contains elements of both a sale of tangible personal property and a service, a taxable entity may only subtract as cost of goods sold the costs otherwise allowed by Comptroller Rule 3.588 in relation to the tangible personal property sold. *See* 34 Tex. Admin. Code § 3.588(c)(7).

The Comptroller Parties assert that "repair and maintenance of goods" under

Tax section 171.1012(d)(9) includes only "repair and maintenance of goods for sale" and does not include repair and maintenance of goods after the goods have been sold. We presume, without deciding, that this is so.

The Comptroller Parties challenge $4,835,572 in "costs of sales applicable to service labor billed to non-affiliated customers" on Line 43 of Defendant's Exhibit 19. The Comptroller Parties also challenge $2,267,218 in "costs of sales applicable to service labor billed to non-affiliated customers" on Line 60 of Defendant's Exhibit 20. We presume, without deciding, that the Comptroller Parties have shown that they conclusively proved that (1) it would have been improper for Xerox to have included the costs on Line 43 of Defendant's Exhibit 19 in Xerox's COGS deduction for Report Year 2008, and (2) it would have been improper for Xerox to have included the costs on Line 60 of Defendant's Exhibit 20 in Xerox's COGS deduction for Report Year 2009.

The Comptroller Parties challenge $17,779,165 in costs on Line 55 of Defendant's Exhibit 19 and $14,801,514 in costs on Line 78 of Defendant's Exhibit 20. The detailed description for both lines is the same: "Service labor related to equipment installs and removals accounted for as Equipment Costs of Sales [and for] service labor incurred during the warranty period." The Comptroller Parties allege that Xerox improperly included these costs in its COGS deduction for Report Year 2008 because the costs related to services provided to Xerox's customers. Xerox argues that these costs were service and production costs for replacement parts under warranty and related to equipment that was held out for sale by Xerox to its customers. Xerox contends that it properly included these costs under Tax Code section 171.1012(a)(2), (c)(2), and (d)(9). After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved the

amount of these costs that were not quality-control costs under Tax Code section 171.1012(d)(9). *See Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844. The Comptroller Parties have not shown that it would have been improper for Xerox to have included these costs in its COGS deduction.

The Comptroller Parties challenge $532,864,713 in costs on Line 235 of Defendant's Exhibit 19 and $523,557,961 in costs on Line 494 of Defendant's Exhibit 20. The detailed description for both lines is the same: "Service labor expenses for 'Sold' equipment." The Comptroller Parties assert that Xerox improperly included these costs in its COGS deduction because the costs related to services provided to Xerox's customers. Hoyt indicated at trial that "sold equipment" in this line includes equipment under sales-type leases but does not include equipment under operating leases or rental agreements. Xerox argues that these costs were labor costs directly related to the production and acquisition of the equipment under Tax Code section 171.1012(c) and quality-control costs under Tax Code section 171.1012(d)(9). After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved the amount, if any, of these costs that were not quality-control costs or direct costs of acquiring or producing goods. *See* Tex. Tax Code Ann. § 171.1012(c); Tex. Tax Code Ann. § 171.1012(d)(9); *Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844. The Comptroller Parties have not shown that it would have been improper for Xerox to have included these costs in its COGS deduction.

The Comptroller Parties challenge $15,542,301 in costs for "[s]ervice labor expenses for Rental equipment" on Line 236 of Defendant's Exhibit 19. We presume, without deciding, that the Comptroller Parties have shown that they

33

conclusively proved that they conclusively proved that (1) the costs on Line 236 of Defendant's Exhibit 19 were based on services for equipment that was not "sold" and thus did not fall within the definition of "goods" under Tax Code section 171.1012(a)(1), and (2) it would have been improper for Xerox to have included these costs in its COGS deduction for Report Year 2008.

The Comptroller Parties challenge $79,469,630 in costs on Line 309 of Defendant's Exhibit 20. The detailed description for both lines is "Labor services purchased from outside agencies on a contract basis. This account is not to be used for consulting services." The Comptroller Parties allege that Xerox improperly included these costs in its COGS deduction because the costs related to services provided to Xerox's customers. Hoyt testified that these costs were for maintenance and service labor performed by contractors hired by Xerox on equipment, some of which was sold and some of which was rented. Xerox argues that these costs were labor costs directly related to the production and acquisition of the equipment under Tax Code section 171.1012(c). After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved the amount, if any, of these costs that were not quality-control costs or direct costs of acquiring or producing goods. *See* Tex. Tax Code Ann. § 171.1012(c); Tex. Tax Code Ann. § 171.1012(d)(9); *Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844. The Comptroller Parties have not shown that it would have been improper for Xerox to have included these costs in its COGS deduction.

The Comptroller Parties challenge $25,182,625 in costs for "services purchased which are not defined in account series 51508001– 8009, e.g., building of necessary items used in manufacturing on research projects; surveys conducted by outside agencies" on Line 359 of Defendant's Exhibit 20. The Comptroller

34

Parties allege that Xerox improperly included these costs in its COGS deduction because the costs related to services provided to Xerox's customers. Hoyt testified that these costs may include research and development costs. Xerox asserted in Plaintiff's Exhibit 40 that these costs were included in Xerox's COGS deduction under Tax Code section 171.1012(c)(9). *See* Tex. Tax Code Ann. § 171.1012(c)(9) ("costs attributable to research, experimental, engineering, and design activities directly related to the production of the goods, including all research or experimental expenditures described by Section 174, Internal Revenue Code"). On appeal, Xerox asserts that it was entitled to deduct these costs under Tax Code section 171.1012(c) and section 171.1012(d)(9). *See* Tex. Tax Code Ann. § 171.1012(c); Tex. Tax Code Ann. § 171.1012(d)(9). After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved the amount, if any, of these costs that were not quality-control costs or direct costs of acquiring or producing goods, or costs attributable to research, experimental, engineering, and design activities directly related to the production of the goods. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322.

### *Challenges to alleged delivery and outbound transportation costs*

The cost of goods sold under Tax Code section 171.1012 does not include distribution costs, including outbound transportation costs, in relation to the taxable entity's goods. *See* Tex. Tax Code Ann. § 171.1012(e)(3) (West, Westlaw through 2021 R.S.); *Hegar v. Sunstate Equip. Co., LLC*, 578 S.W.3d 533, 540 (Tex. App.—Austin 2017), *aff'd*, 601 S.W.3d 685 (Tex. 2020). The Comptroller Parties challenge $128,218,732 in costs on Line 121 of Defendant's Exhibit 19. The description of this item in Defendant's Exhibit 19 and in Plaintiff's Exhibit 39

is the same: "METERED CONSUMABLES COST."[10] In each exhibit there appears to be the beginning of an additional letter at the end of the description that is cut off. The detailed description of this item is "Cost from shipments of consumables to metered customers." Hoyt testified at trial that the account description was "Metered Consumables Cost of" and was cut off. Hoyt testified that he did not think there was anything in the account description that indicated that it was a cost of shipping. Looking at the detailed description, Hoyt admitted that there was "some unclarity as it is as to whether this is a cost of shipping or the cost of the consumables shipped."

The Comptroller Parties also challenge $130,693,407 in costs on Line 139 of Defendant's Exhibit 20. The description of this item in Defendant's Exhibit 20 and in Plaintiff's Exhibit 40 is the same: "METERED CONSUMABLES COST OF S[sic]." The detailed description of this item is "Cost from shipments of consumables to metered customers." Hoyt testified at trial that he thinks Line 139 might be the cost of the consumables themselves and not of the shipments of the consumables. The Comptroller Parties allege that Xerox improperly included these costs in its COGS deduction because the costs relate to delivery or outbound transportation costs. After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved that any of the costs in Line 121 or Line 139 were distribution costs or outbound transportation costs. *See* Tex. Tax Code Ann. § 171.1012(e)(2); *Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844. The Comptroller Parties have not shown that it would have been improper for Xerox to have included these costs in its COGS deduction.

---

[10] Hoyt testified that Plaintiff's Exhibit 39 is the "complete version of Defendants' Exhibit 19."

The Comptroller Parties challenge $6,701,354 in costs on Line 160 of Defendant's Exhibit 19 and $5,345,422 in costs on Line 67 of Defendant's Exhibit 20. The detailed description for both lines is the same: "the cost of expendable miscellaneous packaging and shipping supplies such as tapes, staples, decals, glue, etc." The Comptroller Parties assert that Xerox improperly included these costs in its COGS deduction because the costs relate to delivery or outbound transportation costs. At trial, Hoyt disagreed that these costs were outbound transportation costs. Hoyt stated that he viewed these costs as handling costs allowed under Tax Code section 171.1012(c)(4). *See* Tex. Tax Code Ann. § 171.1012(c)(4) (West, Westlaw through 2021 R.S.) (stating that "[t]he cost of goods sold includes all direct costs of acquiring or producing the goods, including . . . handling costs, including costs attributable to processing, assembling, repackaging"). After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved that any of the costs in Line 160 or Line 67 were distribution costs or outbound transportation costs. *See* Tex. Tax Code Ann. § 171.1012(e)(2); *Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844. The Comptroller Parties have not shown that it would have been improper for Xerox to have included these costs in its COGS deduction.

### *Challenges to research and development costs*

The cost of goods sold under Tax Code section 171.1012 includes all direct costs of acquiring or producing the goods, including "costs attributable to research, experimental, engineering, and design activities directly related to the production of the goods, including all research or experimental expenditures described by Section 174, Internal Revenue Code." *See* Tex. Tax Code Ann. § 171.1012(c)(9). The Comptroller Parties challenge $48,505,173 in costs on Line 24

of Defendant's Exhibit 19 and $42,989,083 in costs on Line 21 of Defendant's Exhibit 20. The detailed description for both lines is the same: "R&D related material expenditures." The Comptroller Parties complain that these costs relate to equipment that is leased as well as equipment that is sold. The Comptroller Parties suggest that the costs attributable to research, experimental, engineering, and design activities directly related to the production of equipment that is leased should not have been included in Xerox's COGS deduction. Hoyt testified at trial that all of these costs should be included in Xerox's COGS deduction. Hoyt testified that research and development costs are not variable per-unit costs. According to Hoyt, research and development costs are incurred upfront, and often prior to any production, and a company incurs these costs to determine whether a product is feasible, whether the product works, whether it can be produced effectively, and the best model for the product.

Hoyt testified that without research-and-development costs, a company is not going to have any products produced that are either sold or provided under sales-type leases. Hoyt stated that all of these research-and-development costs were related to the items that Xerox sold and that the fact that these costs may also be related to items that were leased does not make them any less directly related to the products that Xerox sold. According to Hoyt, all of the research and development leads to the production of all of the products, including those that were sold. In finding of fact 43, the trial court found that trial testimony established that research-and-development costs "are not bifurcated by the type of distribution agreement that is used by the customer to acquire equipment." In the finding, the trial court also found that all research-and-development costs "related to a piece of equipment which [sic] were required to create that equipment." The Comptroller Parties have not asserted or shown that the trial evidence is legally or factually

insufficient to support finding of fact 43. After examining the trial evidence under the applicable standard of review, we conclude that the Comptroller Parties have not shown that they conclusively proved that any of these costs were not costs attributable to research, experimental, engineering, and design activities directly related to the production of Xerox's goods. *See* Tex. Tax Code Ann. § 171.1012(c)(9); *Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844. The Comptroller Parties have not shown that it would have been improper for Xerox to have included these costs in its COGS deduction.

7.     ***The Comptroller Parties' failure to show that they conclusively proved they were entitled to recover on their counterclaim***

For Report Year 2008, Xerox originally reported a total COGS deduction of $4,910,835,415. During the litigation in the trial court below, Xerox reviewed its COGS deduction calculation and determined that its total COGS deduction for Report Year 2008 should have been $5,994,240,999. In their counterclaim, the Comptroller Parties alleged that Xerox's total COGS deduction for Report Year 2008 should have been much less than $4,910,835,415. The Comptroller Parties argued that Xerox's COGS was less than thirty percent of its total revenue of $10,040,814,565, which would be $3,012,244,369.50. The Comptroller Parties had the burden of proving their entitlement to relief on their counterclaim. *See Queen*, 495 S.W.3d at 322. The trial court found against the Comptroller Parties on their counterclaim, and therefore on appeal they must demonstrate that the trial evidence conclusively established their entitlement to recovery on their counterclaim. *See Dow Chem. Co.*, 46 S.W.3d at 241. As to Report Year 2008, we have presumed the Comptroller Parties' complaints have merit as to the following three items: (1) $4,619,370 in costs from Line 119 of Defendant's Exhibit 19, (2) $4,835,572 in costs from Line 43 of Defendant's Exhibit 19, and (3) $15,542,301

in costs from Line 236 of Defendant's Exhibit 19. The sum of these three lines is $24,997,243. We have concluded that all of the Comptroller Parties' other complaints as to Report Year 2008 lack merit. Even presuming for the sake of argument that the Comptroller Parties' complaints as to these costs totaling approximately $25 million have merit, the Comptroller Parties have not shown that the trial evidence conclusively proves that Xerox's total COGS deduction for Report Year 2008 should have been less than $4,910,835,415. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844.

For Report Year 2009, Xerox originally reported a total COGS deduction of $4,995,383,684. During the litigation in the trial court below, Xerox reviewed its COGS deduction calculation and determined that its total COGS deduction for Report Year 2009 should have been $6,647,888,992. In their counterclaim, the Comptroller Parties alleged that Xerox's total COGS deduction for Report Year 2009 should have been much less. The Comptroller Parties argued that Xerox's COGS was less than thirty percent of its total revenue of $10,671,394,110, which would be $3,201,418,233. As to Report Year 2009, we have presumed the Comptroller Parties' complaints have merit as to the following two items: (1) $9,520,568 in costs from Line 137 of Defendant's Exhibit 20, and (2) $2,267,218 in costs from Line 60 of Defendant's Exhibit 20. The sum of these two lines is $11,787,786. We have concluded that all of the Comptroller Parties' other complaints as to Report Year 2009 lack merit. Even presuming for the sake of argument that the Comptroller Parties' complaints as to these costs totaling approximately $12 million have merit, the Comptroller Parties have not shown that the trial evidence conclusively proves that Xerox's total COGS deduction for Report Year 2009 should have been less than $4,995,383,684. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Queen*, 495 S.W.3d at 322; *Bethel*, 635 S.W.2d at 844.

The Comptroller Parties have not shown that the trial evidence conclusively proved their entitlement to recover on their counterclaim. We overrule the Comptroller Parties' first issue.

### III.   CONCLUSION

The Comptroller Parties have not shown that the trial court erred in concluding for each report year that the total revenue from Xerox's activities in wholesale trade was greater than the total revenue from Xerox's activities in trades other than the wholesale trades. The Comptroller Parties have not shown that the trial court erred in determining that the applicable franchise tax rate for Xerox during the Time Period at Issue was 0.5% rather than 1.0%. The Comptroller Parties have not shown that the trial court erred in rendering a take-nothing judgment as to their counterclaim. Accordingly, we affirm the trial court's judgment.


/s/     Randy Wilson
Justice


Panel consists of Justices Zimmerer, Poissant, and Wilson.